# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————— x
                          :

MAJID S. KHAN (ISN 10020),
    Prisoner, United States Naval Station,  :
    Guantanamo Bay, Cuba

                 *Petitioner*,  :

             v.  :

JOSEPH R. BIDEN, JR.,
    President of the United States  :
    The White House
    1600 Pennsylvania Avenue, N.W.  :
    Washington, DC 20500;

LLOYD J. AUSTIN III,
    Secretary, United States  :
    Department of Defense
    1000 Defense Pentagon  :
    Washington, DC 20301-1000; and

ARMY BRIG. GEN. LANCE A. OKAMURA,
    Commander, Joint Task Force-Guantanamo  :
    APO AE 09360,

              *Respondents*.  :

———————————————————— x

Case: 1:22−cv−01650
Assigned To : Walton, Reggie B.
Assign. Date : 6/7/2022
Description: Habeas/2255 (G−DECK)

Civil Action No. 22-_____

## PETITION FOR WRIT OF HABEAS CORPUS

Petitioner Majid S. Khan respectfully petitions this Court for a writ of habeas corpus. The writ should be granted pursuant to 28 U.S.C. §§ 2241 and 2243, and the Court's equitable habeas powers, because Petitioner's detention violates U.S. and international law.

## THE PARTIES

1.      Petitioner is imprisoned at the United States Naval Station at Guantanamo Bay, Cuba.  He is identified at Guantanamo by Internment Serial Number (ISN) 10020.  On February 29, 2012, Petitioner pled guilty to serious offenses before a military commission at Guantanamo. Pursuant to the terms of his plea agreement, he cooperated with U.S. authorities for more than a decade.  He provided complete and accurate information, amounting to substantial assistance to U.S. authorities, regarding his own conduct and that of other terrorism suspects, including members of Al Qaeda in Pakistan, Southeast Asia, and the United States.  He did so at substantial, continuing risk to himself and his family.  In light of his unequivocal acceptance of responsibility and unwavering cooperation—memorialized, in part, in sentencing letters submitted by the U.S. Department of Justice—Petitioner was sentenced to 10 years of imprisonment.  He completed that sentence on March 1, 2022.  However, he continues to be imprisoned at Guantanamo, beyond the expiration of his sentence, and without foreseeable end. Petitioner's conditions of confinement at Guantanamo also have not improved since his sentence ended; in certain respects, they have become *more* punitive.  For example, since completing his sentence, Petitioner's access to his counsel has been significantly restricted and effectively denied by Respondents.

2.      Respondent Joseph R. Biden, Jr., is President of the United States, and Commander-in-Chief of the United States Armed Forces.

3.      Respondent Lloyd J. Austin III is United States Secretary of Defense.

4.      Respondent Lance A. Okamura is a United States Army Brigadier General, and Commander of Joint Task Force-Guantanamo (JTF-GTMO).  He oversees the detention facility at Guantanamo.

5.      Respondents have possession, custody and control of Petitioner.

## FACTUAL BACKGROUND

6.      Petitioner is a citizen of Pakistan.  He was born in Saudi Arabia in 1980, and obtained political asylum in the United States in 1996.  He grew up near Baltimore, Maryland, and graduated from Owings Mills High School in 1999.  After high school, he worked as an Oracle database manager in the Baltimore area and around the National Capital Region.  Many of his family members still live in the area and are U.S. citizens.  Petitioner also has a wife and a daughter whom he has never met because she was born after his capture.  They live in Pakistan.

### Petitioner's Capture and Detention

7.      In 2002, Petitioner went to Pakistan to get married, and while there, he was introduced by his extended relatives to, and became involved with, Al Qaeda.  Petitioner went back to the United States after getting married, but later returned to Pakistan because he missed his wife.  He continued his involvement with Al Qaeda, and was captured in Pakistan in March 2003.  He was detained in the Central Intelligence Agency's Rendition, Detention, and Interrogation (RDI) program for more than three years, where he was tortured.[1]

8.      In September 2006, Petitioner was transferred to Guantanamo.

---

[1] Petitioner described his torture at length in open court at his sentencing.  *See* Tr. at 1118-89, *United States v. Khan* (Mil. Comm'n Oct. 28, 2021), https://www.mc.mil/Portals/0/pdfs/Khan/ Khan%20(TRANS28Oct2021-MERGED).pdf.  His torture is also detailed in the Senate Select Committee on Intelligence report on the RDI program, which was declassified in part in December 2014, and is available at http://www.feinstein.senate.gov/public/index.cfm/files/ serve?File_id=7c85429a-ec38-4bb5-968f-289799bf6d0e&SK=D500C4EBC500E1D256 BA519211895909.

9.    On September 29, 2006, Petitioner filed a habeas corpus petition before this

Court, *Khan v. Bush*, No. 06-cv-1690 (RBW), challenging the legality of his initial capture and

detention.  The case was dismissed more than six years later, without prejudice, pursuant to the

terms of his military commission plea agreement.  *See* Minute Order, *Khan v. Obama*, No. 06-

cv-1690 (RBW) (D.D.C. Apr. 23, 2013).

10.    On August 15, 2007, Petitioner filed a petition for review under the Detainee

Treatment Act of 2005 (DTA) before the D.C. Circuit, *Khan v. Gates*, No. 07-1324, challenging

his "enemy combatant" designation by a Combatant Status Review Tribunal at Guantanamo.

The DTA petition was dismissed following the Supreme Court's decision in *Boumediene v.

Bush*, 553 U.S. 723 (2008), which held that Guantanamo detainees have a constitutionally-

protected right to petition for habeas relief.  *See* Order, *Khan v. Gates*, No. 07-1324 (D.C. Cir.

Apr. 24, 2009) (per curiam).

11.    Petitioner was denied access to his counsel until October 2007.

12.    After being afforded access to his counsel, Petitioner approached the U.S.

Department of Justice and expressed his willingness to plead guilty and cooperate with U.S.

authorities.  Those negotiations began in 2009 with federal prosecutors from the U.S. Attorney's

Office for the Southern District of New York, and were broadened to include prosecutors from

the Office of Military Commissions within the U.S. Department of Defense, including a federal

prosecutor detailed from the National Security Division at the Justice Department to the Office

of Military Commissions.  The negotiations resulted in Petitioner proffering in September 2010.

13.    The negotiations stalled, however, through no fault of Petitioner's, due to the

prosecutors' inability to move him out of the location where he had been held since his arrival at

Guantanamo and away from other detainees against whom he was cooperating, including for his

safety.  They also stalled due to lingering uncertainty about which venue would be used to

prosecute detainees after the Obama administration withdrew plans to prosecute the 9/11

criminal case in New York in April 2011.

14.     Negotiations between Petitioner's counsel and the Justice Department prosecutor

detailed to the military commissions eventually resumed, culminating in Petitioner's agreement

to plead guilty before a military commission and cooperate with U.S. authorities for a decade.

### Petitioner's Guilty Plea and Cooperation Agreement

15.     Pursuant to the Military Commissions Act (MCA), 10 U.S.C. §§ 948a *et seq.*, and

its implementing rules and regulations promulgated by the Secretary of Defense pursuant to his

authority under the MCA, military commission prosecutors swore five charges against Petitioner

on February 13, 2012: conspiracy, murder in violation of the law of war, attempted murder in

violation of the law of war, providing material support for terrorism, and spying.[2]  Petitioner also

entered into a stipulation of fact with commission prosecutors on February 13, 2012, regarding

his own conduct and that of other terrorism suspects.  *See* PE 001, *United States v. Khan* (Mil.

Comm'n Feb. 29, 2012).[3]

---

[2] Petitioner pled guilty to the murder charges in relation to the bombing of a hotel in Jakarta, Indonesia, in August 2003.  He pled guilty pursuant to a completed conspiracy theory of liability. *See Pinkerton v. United States*, 328 U.S. 640 (1946) (holding defendant may be held responsible for reasonably foreseeable substantive offenses committing by co-conspirators in furtherance of conspiracy).  In December 2002, Petitioner delivered money from Pakistan to Thailand on behalf of Al Qaeda, which was later comingled with other funds, a portion of which was used to carry out the bombing.  Petitioner accepted criminal responsibly for the deaths caused by other individuals connected to Al Qaeda who planned and carried out the bombing, even though he did not know about the bombing or that the money he delivered would be used in the bombing, which occurred five months after his capture in March 2003.

[3] All of the transcripts and pleadings from Petitioner's military commission case are publicly available in the searchable database at https://www.mc.mil/CASES/MilitaryCommissions.aspx.

16.     On February 15, 2012, the Convening Authority for Military Commissions referred the charges for trial by military commission.[4]  The Convening Authority, on behalf of the government, also entered into a plea agreement with Petitioner on February 15, 2012.  The agreement was comprised of an Offer for Pretrial Agreement and Appendix A to the Offer for Pretrial Agreement, dated February 13, 2012, and two later written modifications, one of which dropped the material support for terrorism charge against Petitioner.  *See* AE 012, *United States v. Khan* (Mil. Comm'n Feb. 29, 2012); AE 013, *United States v. Khan* (Mil. Comm'n Feb. 29, 2012); AE 012A, *United States v. Khan* (Mil. Comm'n Sept. 14, 2016); AE 012B, *United States v. Khan* (Mil. Comm'n Apr. 20, 2021).[5]

17.     The plea agreement required Petitioner to cooperate with U.S. authorities in exchange for a reduced sentence not to exceed 11 years from the date of his guilty plea.[6] Paragraph 13 of the plea agreement described the specific acts that Petitioner was required to take in order to fulfill his cooperation obligations, as follows:

> I agree to cooperate fully and truthfully with the Government.  This cooperation includes, but is not limited to, providing complete and accurate information in interviews, depositions, and testimony wherever and whenever requested by prosecutors from the Office of Military Commissions, the United States

---

[4] The Convening Authority is the Pentagon official who oversees the military commissions at Guantanamo, and whose responsibilities are prescribed by the MCA and its implementing rules and regulations.

[5] The material support charge was withdrawn based on the D.C. Circuit's holding that the offense is not triable by military commission based on pre-2006 conduct because it would violate the Ex Post Facto Clause of the Constitution.  *See Al Bahlul v. United States*, 767 F.3d 1, 29 (D.C. Cir. 2014) (en banc).

[6] The military judge later reduced Petitioner's maximum sentence with cooperation by an additional year, to a maximum of 10 years, as a sanction for discovery violations by commission prosecutors.  *See* AE 047K at 13, *United States v. Khan* (Mil. Comm'n July 13, 2020); AE 047O at 4 & n.11, *United States v. Khan* (Mil. Comm'n Feb. 18, 2021).

Department of Justice, United States law enforcement, military, or intelligence authorities while in United States custody.

AE 012, ¶ 13.

18.     The plea agreement also included a qualified waiver of Petitioner's appellate rights, but specifically preserved his right to petition for habeas relief from continuing detention if he is not released after completing his sentence:

> [A]fter I have served any unsuspended portion of an approved sentence to confinement, I retain the right to seek release from the appropriate United States authorities by challenging my continued detention, if any, through a petition for a writ of habeas corpus or other available remedies.

*Id.*, ¶ 11; *see also* Tr. at 81, *United States v. Khan* (Mil. Comm'n Feb. 29, 2012) (government stating Petitioner has right to file habeas petition if he "continues to be detained in any respect" after serving sentence).

19.     On February 29, 2012, pursuant to his plea agreement, Petitioner pled guilty before a military commission to the charges referred against him and agreed to cooperate with U.S. authorities.

### Petitioner's Cooperation with U.S. Authorities

20.     Throughout the decade following his guilty plea, Petitioner provided complete and truthful information to U.S. authorities in fulfillment of his cooperation obligations.  Indeed, after initially agreeing in his plea agreement to delay his sentencing for four years in order to cooperate with U.S. authorities, Petitioner twice agreed to extend his sentencing for several more years in order to continue cooperating with U.S. authorities pursuant to his plea agreement.  As a former prosecutor detailed to Petitioner's military commission case put it, he joined "Team USA" and never looked back from that decision.

21.     The nature and duration of Petitioner's cooperation—for more than a decade, in some of the most important international terrorism investigations and prosecutions in U.S.

history, including the 9/11 commission case—is not disputed.  It is, however, unprecedented in the military commissions at Guantanamo, and in military justice generally, and is commensurate with cooperation in other important international terrorism cases prosecuted in Article III courts.[7]

22.     Petitioner took full responsibility for his own conduct and never wavered in his commitment to "cooperate fully and truthfully with the Government" and provide "complete and accurate information" to U.S. authorities.  He never refused to meet with U.S. authorities requesting his cooperation; never withheld information, including damaging information about terrorist acts involving his own relatives; and did so despite his cooperation placing him and his family at risk of personal harm.  That risk of harm is so great that Petitioner can never return to Pakistan where he would face persecution.  He also never minimized or exaggerated his own conduct or that of others; and the information he provided about himself and others was complete, accurate, and consistent over more than 10 years.

23.     Moreover, Petitioner has repeatedly, publicly expressed regret for his actions, apologized to the victims of his offenses and their families, and explained his decision to cooperate with U.S. authorities against Al Qaeda for more than a decade as an effort to atone for his offenses.  *See*, *e.g.*, Tr. at 179-81, *United States v. Khan* (Mil. Comm'n Sept. 14, 2016); Tr. at 1118-89, *United States v. Khan* (Mil. Comm'n Oct. 28, 2021).

24.     As explained by the former FBI Special Agent in Charge at Guantanamo in a letter supporting clemency for Petitioner:

---

[7] *See*, *e.g.*, Aaron Katersky, *Man Who Plotted NYC Subway Bombing to Be Released After Nearly a Decade of Cooperation*, ABCNews.go.com, May 1, 2019 (Al Qaeda defendant who pled guilty to bombing and murder conspiracy receives sentence of 10 years, effectively time served, with cooperation); Mikey Light & Larry McShane, *Would-Be NYC Subway Bomber Turned "Extraordinary" Cooperating Witness Takes Step Toward Freedom*, N.Y. Daily News, Dec. 14, 2018 (same).

To this day, he has never looked back, and has done everything that's been asked of him in terms of cooperation.  He's been truthful and consistent in his recitations of the events leading to his detention to include his treatment before being transferred to Guantanamo Bay.  Majid has never minimized his role in the events in which he was implicated and has never refused to meet with U.S. authorities or provide information. . . .[8]

As the Special Agent further explained in the letter, Petitioner has provided a "sustained level of cooperation which he has provided to the United States. . . [and] is not a threat to the US or US-interests."

25.     Indeed, for more than a decade, since at least September 2010, when he first proffered with the U.S. Attorney's Office in the Southern District of New York, Mr. Khan met with, was thoroughly debriefed by, and otherwise provided substantial, valuable information to the FBI, military commission prosecutors, federal prosecutors, and other military, intelligence, and law enforcement authorities.

26.     As illustrated by the stipulation of fact in Petitioner's commission case, and the sentencing letters attached hereto from the U.S. Attorney's Office for the Southern District of New York and the Department of Justice, Federal Programs Branch, Petitioner provided information to U.S. authorities that has been used to investigate and build legal cases against numerous other Guantanamo detainees, criminal defendants, and others suspected or accused of terrorist acts or other serious offenses.  *See* Exs. A & B.  As the FBI Special Agent in Charge at Guantanamo explained in his clemency letter, other FBI agents "consistently stated that Majid was being both truthful and helpful with other criminal investigations to include those related to the 9-11 attacks."  *See also*  PE 001, *United States v. Khan* (Mil. Comm'n Feb. 29, 2012).  For example, these individuals included:

---

[8] Petitioner intends to move to supplement the record with a copy of the clemency letter filed under seal.

- Mr. Khan's uncharged cousin and uncle in Pakistan;

- 9/11 commission defendants Khalid Sheikh Mohammed and Ammar Al Baluchi;

- Commission defendant Encep Nurjaman a/k/a Hambali;

- Commission defendant and Guantanamo habeas petitioner Mohd Nazir bin Lep a/k/a Lillie;

- Commission defendant Mohd Farik bin Amin a/k/a Zubair;

- Hambali's uncharged brother Rusman Gunawan a/k/a Gun Gun;

- Commission defendant Hadi Al Iraqi a/k/a Nashwan Al Tamir;

- Guantanamo habeas petitioner Hassan bin Attash (ISN 1456);

- Criminal defendant Aafia Siddiqui;

- Criminal defendant and denaturalized U.S. citizen Iyman Faris;

- Uncharged suspect Jaffar Al Tayyar;

- Guantanamo habeas petitioner Saifullah Paracha (ISN 1094); and

- Saifullah Paracha's son and criminal defendant Uzair Paracha.

Petitioner has also provided information to the FBI about Al Qaeda's sources and methods, and its activities in several locations, as well as about other individuals, organizations, and nations.

### Sentencing and Post-Trial Proceedings

27.     On March 11, 2022, in recognition of Petitioner's fulfillment of his cooperation obligations under his plea agreement, the Convening Authority for Military Commissions issued an order approving Petitioner's sentence of 10 years of imprisonment.[9]

---

[9] The Convening Authority also considered a clemency letter submitted by seven of the eight senior military officers who served on Petitioner's jury, which stated that Petitioner's torture was "a stain on the moral fiber of America."  Carol Rosenberg, *U.S. Military Jury Condemns Terrorist's Torture and Urges Clemency*, N.Y. Times (Oct. 31, 2021), https://www.nytimes.com/2021/10/31/us/politics/guantanamo-torture-letter.html (linking to letter).

28.     Applying credit for time-served from the date of his guilty plea, pursuant to the terms of his plea agreement, Petitioner's commission sentence concluded March 1, 2022.  The Convening Authority's order approving Petitioner's sentence thus affected the disposition of his case by making him subject to transfer from Guantanamo.

29.     Petitioner has not been transferred from Guantanamo, however, nor is his transfer reasonably foreseeable.

30.     Petitioner's conditions of confinement at Guantanamo also have not improved since his sentence ended.  Respondents have not taken sufficient steps to prepare Petitioner for transfer and resettlement.  Petitioner remains imprisoned as he was for more than a decade while he served his sentence.  He is held by himself, away from other detainees, and without direct access to his family or the outside world.  For example, Respondents continue to deny him direct telephone calls with his family which is indispensable in terms of helping him to prepare for life after Guantanamo.  Respondents also continue to deny him a laptop or other means to study and prepare himself for transfer and resettlement.  He has also requested to meet with Fionnuala D. Ni Aolain, the United Nations Special Rapporteur for Counterterrorism and Human Rights, for the purpose of facilitating his transfer and resettlement, but that request has not been approved by Respondents.  Nor have Respondents approved Petitioner's repeated requests to meet with officials from the U.S. State Department at Guantanamo to discuss his transfer and resettlement.

31.     From Petitioner's perspective—from what he experiences day-to-day at Guantanamo—his life remains in nearly all respects the same as it was while he was serving his sentence.  It certainly does not appear to him that Respondents intend to release him or otherwise contemplate his transfer and resettlement in the foreseeable future.

32.     If anything, Petitioner's conditions of confinement at Guantanamo have become *more* punitive in certain respects since he completed his sentence.  For example, Petitioner's access to his counsel has been significantly restricted and effectively denied by Respondents.  Respondents Austin and Okamura, in particular, have limited Petitioner's ability to meet with his counsel at Guantanamo, and, in fact, have cut off entirely Petitioner's ability to speak with his counsel via secure videoconferencing—a method of communication that was routine prior to Petitioner's completion of his sentence.  They appear to have done so on the purported basis that Petitioner no longer has an "active case" before a military commission, and, further, in order to prioritize communications between other counsel and their clients with ongoing commission cases on the mistaken belief that those clients are entitled to greater counsel access than Petitioner because he has completed his sentence.[10]

33.     For all of these reasons, and for the reasons set forth below, Petitioner's continuing imprisonment at Guantanamo is unlawful in several respects.

## CLAIMS FOR RELIEF

### COUNT I

### PETITIONER'S CONTINUED IMPRISONMENT VIOLATES THE MILITARY COMMISSIONS ACT

34.     On December 31, 2011, Congress enacted the National Defense Authorization Act for Fiscal Year 2012 ("2012 NDAA"), Pub. L. No. 112-81, 125 Stat. 1298.  Section 1021(a) clarifies the President's authority under the Authorization for Use of Military Force ("AUMF"),

---

[10] Respondents have likewise restricted counsel access for detainees such as habeas petitioner Guled Hassan Duran, ISN 10023, in the case *Duran v. Obama*, No. 16-cv-2358 (RBW) (D.D.C. filed Nov. 30, 2016), apparently on the mistaken belief that he no longer requires such access because he was approved for transfer from Guantanamo via the Periodic Review Board process established pursuant to Executive Order 13,567, 76 Fed. Reg. 13,277 (Mar. 7, 2011).

Pub. L. No. 107-40, § 2(a), 115 Stat. 224, 224 (2001), to detain in U.S. military custody certain

"covered persons . . . pending disposition under the laws of war."  2012 NDAA, § 1021(a), 125

Stat. at 1562.

35.     Section 1021(b) of the 2012 NDAA defines "covered persons" to include those

who were responsible for the September 11, 2001 attacks, and those who were part of Al Qaeda,

the Taliban or certain associated forces.

36.     Section 1021(c) of the 2012 NDAA further provides four possible "disposition[s]

of a person under the law of war":

> (1) "Detention under the law of war without trial until the end of hostilities
>     authorized by the [AUMF]";
>
> (2) "Trial under [the MCA]";
>
> (3) "Transfer for trial by an alternative court or competent tribunal having lawful
>     jurisdiction";
>
> (4) "Transfer to the custody or control of the person's country of origin, any other
>     foreign country, or any other foreign entity."

The plain language of this provision makes clear that the government cannot impose both

indefinite "[d]etention under the law of war *without trial*" and "[t]rial" by military commission or

before another tribunal.  *Id.* (emphasis added).  By definition, choosing to conduct a trial

forecloses detention without trial.  And that plain language reflects an obvious reality: the trial

would be meaningless if the government could continue to detain a covered person indefinitely

even where the trial resulted in an acquittal or, as here, a completed sentence.[11]  Such an

---

[11] In keeping with this statutory command, a recent Department of Defense directive expressly
prohibits the continued detention of a covered person after the conclusion of his sentence.  *See*
Dep't of Defense Directive 2310.01E, DOD Detainee Program, § 3.13(e) (Mar. 15, 2022),
https://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodd/231001e.pdf?ver=6y1Oz3Q
qY1slOmu_p9g9Fw%3d%3d ("A civilian internee convicted of a criminal offense will be
released from punitive confinement when the court-administered sentence to confinement

interpretation would violate both common sense and the basic canon of statutory construction requiring meaningful differentiation among the possible dispositions. *See* Mem. Opinion at 18-19, *Gul v. Biden*, No. 16-cv-1462 (APM) (D.D.C. Nov. 9, 2021), ECF No. 141 (Mehta, J.) (construing 2012 NDAA to ensure no provision is superfluous, void, or insignificant, and granting detainee habeas petition).[12]

37.     Indeed, Congress expressly considered an amendment proposed by Senator Sessions that would have authorized the government to continue to detain a covered person even after a trial. That amendment would have added a fifth option to the list of dispositions:

> (5) Notwithstanding disposition under paragraph (2) or (3), further detention under the law of war until the end of hostilities authorized by the Authorization for Use of Military Force.

157 Cong. Rec. 18073 (2011) (statement of Sen. Sessions) (proposing S.Amdt 1274). The Senate rejected that amendment by a vote of 59-41. U.S. Senate, *Roll Call Vote 112th Congress - 1st Session, On the Sessions Amendment No. 1274* (Dec. 1, 2011), https://www.senate.gov/ legislative/LIS/roll_call_ votes/vote1121/vote_112_1_00217.htm. That rejection provides further confirmation that the government cannot detain a covered person without trial after choosing to try him.

---

ends."); *see also id*. § 3.13(b) ("Detainees who have been convicted of an offense or against whom criminal proceedings for an offense are pending may be detained until the end of such proceedings and, where applicable, until the completion of the sentence.")

[12] The Guantanamo Review Task Force, established pursuant to Executive Order 13,492, 74 Fed. Reg. 4897 (Jan. 22, 2009), likewise concluded that a detainee is "eligible for continued detention under the AUMF *only if . . . prosecution of the detainee by the federal government is not feasible in any forum . . .*" Dep't of Justice et al., *Final Report, Guantanamo Review Task Force*, 8 (Jan. 22, 2010), https://www.justice.gov/sites/default/files/ag/legacy/2010/06/02/guantanamo-review-final-report.pdf (emphases added); *see also id.* at 7-8 (decisions to prosecute based on guidelines in *United States Attorneys' Manual*, including probable sentence).

38.     Petitioner was a "covered person" under Section 1021(b) of the 2012 NDAA at the time of his capture in March 2003.  Petitioner had no prior knowledge or involvement in the September 11, 2001 attacks.  Consistent with his guilty plea before the military commission, however, Petitioner was part of Al Qaeda.  Petitioner never swore an oath of allegiance to Al Qaeda, but he became a functional part of Al Qaeda between January 2002 and March 2003.

39.     On February 12, 2012, the U.S. Attorney General, in consultation with the U.S. Secretary of Defense, formally designated Petitioner for trial by military commission under the MCA, thus disposing of his case for purposes of Section 1021(c) of the 2012 NDAA.  *See* Ex. C (Letter from Assistant Attorney General Lisa Monaco to DOD General Counsel Jeh Johnson).

40.     Petitioner thus was charged and tried before a military commission, and has now completed his sentence pursuant to the MCA.  Because Petitioner has completed his sentence, and because the MCA does not authorize his continued imprisonment beyond the conclusion of his sentence, his continued imprisonment violates the MCA.

41.     Petitioner is not a law-of-war detainee.  Neither the MCA, nor other authority, authorizes Respondents to change Petitioner's law of war disposition under the 2012 NDAA, more than a decade after the fact, from trial by military commission to indefinite detention without trial under the AUMF.  For to do so would render Petitioner's military commission trial and sentencing utterly meaningless.[13]

42.     Petitioner has been in U.S. custody for nearly 20 years, has served his military commission sentence, and must be released from Guantanamo—as every other defendant who

---

[13] *See also New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." (quotation marks and alteration omitted)).

has served a military commission sentence of less than life imprisonment has been transferred—
Salim Hamdan, David Hicks, Omar Khadr, Ibrahim al Qosi, Noor Uthman, and Ahmed Al Darbi.

43.     Indeed, at the time of Petitioner's guilty plea in February 2012, the then-Chief
Prosecutor for Military Commissions addressed speculation about whether the U.S. government
might attempt to hold Petitioner beyond the completion of his military commission sentence.  He
explained that the government's record of transferring commission defendants upon completion
of their sentences was vitally important to ensuring the integrity of the military commission
system and the interests of justice.  He understood that the government's failure to transfer
Petitioner promptly after serving a legally imposed sentence would render Petitioner's guilty
plea, his cooperation agreement, his sentence, and the entirety of the MCA process useless—an
exercise in futility.  There would certainly be no purpose in proceeding with other military
commission cases if the system achieved no practical outcomes and instead functioned as a road
to nowhere.[14]

## COUNT II

### PETITIONER'S CONTINUED IMPRISONMENT VIOLATES THE AUTHORIZATION FOR USE OF MILITARY FORCE

44.     As explained in Count I, the Attorney General's determination, in consultation
with the Secretary of Defense, that Petitioner's disposition under the law of war should be trial
before a military commission precludes his indefinite detention without trial under the AUMF
now, more than a decade later.  In the alternative, even if Petitioner's military commission trial

---

[14] *Guantanamo Bay Detainee Majid Shoukat Khan Commission Hearing Press Conference*, at
22:50 (Feb. 29, 2012), https://www.dvidshub.net/video/138628/guantanamo-bay-detainee-majid-
shoukat-khan-commission-hearing-press-conference.   In fact, what happens in Petitioner's case
has a direct impact on plea negotiations in other commission cases.  *See* Carol Rosenberg, *The
9/11 Trial: Why Are Plea Bargain Talks Underway?*, N.Y. Times (Mar. 20, 2022),
https://www.nytimes.com/2022/03/20/us/politics/sept-11-trial-guantanamo.html.

and sentence were utterly meaningless and thus he was now subject to the AUMF, his continued imprisonment would violate the AUMF.

45.     The government claims authority to hold Guantanamo detainees indefinitely pursuant to the AUMF.[15]  But the AUMF permits only the use of "necessary and appropriate force against those nations, organizations, or persons [the President] determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons."   AUMF § 2(a), 115 Stat. at 224.  The AUMF does not authorize the detention of anyone the government deems a terrorist or terrorist sympathizer; nor does it authorize unlimited, unreviewable detention.

46.     As noted above, Petitioner had no prior knowledge or involvement in the September 11, 2001 attacks.  However, between January 2002 and March 2003, he became a functional part of Al Qaeda within the meaning of the AUMF.  *See* 2012 NDAA, § 1021(b)(1), 125 Stat. at 1562.

47.     Despite his undisputed involvement with Al Qaeda prior to his capture in March 2003, Petitioner is no longer a part of, or a substantial supporter of, "al-Qaeda, the Taliban, or associated forces that are engaged in hostilities against the United States or its coalition partners."  *Id.* § 1021(b)(2).  Petitioner has not been part of Al Qaeda or any terrorist group at least since the time he began cooperating with U.S. authorities more than a decade ago.

48.     To the contrary, Petitioner has, through his words and actions, repeatedly and publicly, renounced, disavowed, and otherwise affirmatively and unequivocally disassociated

---

[15] *See* Resp'ts' Mem. Regarding the Govt's Detention Authority Relative to Detainees Held at Guantanamo Bay, *In Re Guantanamo Bay Detainee Litigation*, No. 08-mc-442 (D.D.C. Mar. 13, 2009), ECF No. 1689.

himself with Al Qaeda and terrorism.  Indeed, pursuant to his plea agreement, he worked with

U.S. authorities for more than a decade to defeat Al Qaeda, and he has done so at substantial,

continuing risk to himself and his family, which precludes his indefinite detention under the

AUMF.

49.     As prior decisions of this Court have recognized in granting detainee habeas

petitions, "once Al Qaeda" does not mean "always Al Qaeda" for purposes of continued

detention under the AUMF.  *See Basardh v. Obama*, 612 F. Supp. 2d 30, 35 (D.D.C. 2009)

(public knowledge of detainee's cooperation with U.S. authorities post-capture severed his prior

relationship with Al Qaeda); *Al-Ginco v. Obama*, 626 F. Supp. 2d 123, 128 n.6 (D.D.C. 2009)

(statement by government during argument that "we are not saying once a Taliban, always a

Taliban"); *cf. Salahi v. Obama*, 710 F. Supp. 2d 1, 16 (D.D.C. 2010) (prior interactions with Al

Qaeda insufficient to demonstrate membership at time of capture), *vacated and remanded for

further factfinding*, 625 F.3d 745 (D.C. Cir. 2010).

50.     In addition, Petitioner's continued detention is not authorized by the AUMF

because the AUMF limits the duration of his detention.  Petitioner has been in U.S. custody or

control for nearly 20 years—nearly twice as long as his commission sentence.  His continued

detention is not authorized by the AUMF because it is arbitrary, indefinite and perpetual, and

does not serve its ostensible purpose of preventing his return to the battlefield.

### COUNT III

### PETITIONER'S CONTINUED IMPRISONMENT
### VIOLATES *HAMDI V. RUMSFELD* AND THE LAW OF WAR

51.     The AUMF does not directly authorize detention.  The Supreme Court held in

*Hamdi v. Rumsfeld*, 542 U.S. 507, 521 (2004), that the power to detain may be inferred from the

right to use force under "longstanding law-of-war principles."  Detention is non-punitive and its

sole purpose is "to prevent captured individuals from returning to the field of battle and taking up

arms once again." *Id.* at 518; *id.* at 519 (although the AUMF "does not use specific language of

detention," detention "to prevent a combatant's return to the battlefield is a fundamental incident

of waging war" and thus permitted).  Detention is authorized in the "narrow circumstances"

where necessary to prevent return to the battlefield, but may last "no longer than active

hostilities."  *Id.* at 519-20.

52.    The government has long acknowledged that its AUMF detention authority is

informed and limited by these law-of-war principles.  *See* Resp'ts' Mem. Regarding the Gvt's

Detention Authority Relative to Detainees Held at Guantanamo Bay at 1, *In Re Guantanamo Bay

Detainee Litigation*, No. 08-mc-442 (TFH) (D.D.C. Mar. 13, 2009), ECF No. 1689 ("Principles

derived from law-of-war rules governing international armed conflicts, therefore, must inform

the interpretation of the detention authority Congress has authorized for the current armed

conflict." (citing Geneva Conventions)).

53.    Petitioner's detention violates the AUMF's qualified force authorization, the

Supreme Court's holding in *Hamdi*, and the law of war because his detention is arbitrary,

indefinite and perpetual, and does not serve its ostensible purpose of preventing his return to the

battlefield.  In particular, as explained above, because Petitioner has affirmatively disassociated

himself from Al Qaeda and involvement in terrorism, cooperated with U.S. authorities for more

than a decade against Al Qaeda, and done so at substantial, continuing risk to himself and his

family, he cannot under any circumstances "return to the battlefield" or "take up arms once

again" because Al Qaeda and others against whom he has cooperated *would kill him*.  Indeed,

upon cooperating with U.S. authorities, Petitioner had to be moved away from other detainees in

part for his own safety.  As Petitioner and Respondents likewise agree, Petitioner cannot be

repatriated to Pakistan because he would face a substantial risk of persecution from myriad state and non-state actors, including members of his own extended family who are involved with Al Qaeda and against whom he cooperated.  For the same reasons, his wife and daughter in Pakistan must be safely resettled with him in a country other than Pakistan.  As noted above, Petitioner long ago joined "Team USA" and has never looked back from that decision.

54.     Moreover, Petitioner's continued detention is not authorized by the AUMF because even in circumstances where detention may be "necessary and appropriate" to prevent a combatant's return to the battlefield—which it is not in Petitioner's case—that justification "unravels" if the practical circumstances of the conflict are entirely unlike those that informed the development of the laws of war.  *See Hamdi*, 542 U.S. at 521 ("If the practical circumstances of a given conflict are entirely unlike those of the conflicts that informed the development of the law of war, that understanding may unravel.").

55.     Whatever traditional law-of-war detention authority may have existed at the time of Petitioner's capture and detention has unraveled.  To the extent that an armed conflict with Al Qaeda continues, the practical circumstances of that conflict have become entirely unlike those of the conflicts that have informed the development of the laws of war.

56.     The President has also ended U.S. involvement in Afghanistan.[16]  That war, which was the narrow focus of the Supreme Court's *Hamdi* decision, is over, and any remaining

---

[16] *See Remarks by President Biden on the End of the War in Afghanistan*, The White House (Aug. 31, 2021) ("Last night in Kabul, the United States ended 20 years of war in Afghanistan – the longest war in American history. . . . We succeeded in what we set out to do in Afghanistan over a decade ago.  Then we stayed for another decade.  It was time to end this war. . . . As we close 20 years of war and strife and pain and sacrifice, it's time to look to the future, not the past . . ."); *see also Remarks by President Biden on the Drawdown of U.S. Forces in Afghanistan*, The White House (July 8, 2021) ("The United States cannot afford to remain tethered to policies creating a response to a world as it was 20 years ago. . . . We're ending America's longest war . . . ").

conflict with Al Qaeda or its successors or franchise groups outside of Afghanistan bears no resemblance to the particular conflict in which Petitioner was captured and detained.[17]

57.     Petitioner's involvement with Al Qaeda has long ended.  Even if some armed conflict persists somewhere in the world with Al Qaeda or its successors or franchise groups, it is not the same as the conflict in which Petitioner was captured and detained.

**COUNT IV**

**PETITIONER'S DETENTION UNTIL THE END OF HOSTILITIES WOULD VIOLATE THE GENEVA CONVENTIONS BECAUSE HE IS A CIVILIAN UNDER THE LAW OF WAR**

58.     Petitioner is not detainable until the end of hostilities in any event because he is a civilian under the law of war, regardless of whether he is held in relation to international or non-international armed conflict, and the law of war prohibits the arbitrary detention of civilians regardless of the nature of the conflict.  *See*, *e.g.*, Jean-Marie Henckaerts & Louise Doswald-Beck, 1 *Customary International Humanitarian Law*, Rule 99, at 348 (Int'l Comm. of the Red Cross 2009), https://ihl-databases.icrc.org/customary-ihl/eng/docs/v1_rul_rule99.

59.     Simply stated, detention until the end of hostilities to prevent return to the battlefield is a concept that applies only to prisoners of war, which in turn is a status that exists only in international armed conflicts.  International armed conflicts are fought between nation-states, and the treatment of captives in these conflicts is governed by the detailed provisions of the Third and Fourth Geneva Conventions.[18]  But the conflict with Al Qaeda is not, and has

---

[17] Petitioner did not attend a terrorist training camp in Afghanistan, nor did he fight in Afghanistan, prior to his capture in March 2003.

[18] Geneva Convention (III) Relative to the Treatment of Prisoners of War art. 2, Aug. 12, 1949, 6 U.S.T. 3316 ("Third Geneva Convention"); Geneva Convention (IV) Relative to the Protection of Civilian Persons in Time of War art. 2, Aug. 12, 1949, 6 U.S.T. 3516 ("Fourth Geneva Convention").

never been, an international armed conflict. *See Hamdan v. Rumsfeld*, 548 U.S. 557, 628-29

(2006). As Petitioner and the government also agree, Petitioner is not a prisoner of war. *See* PE

001, ¶ 2(1)-(8), *United States v. Khan* (Mil. Comm'n Feb. 29, 2012). The concept of detention

until the end of hostilities therefore does not apply to Petitioner.

      60.     If Petitioner is now ostensibly detained beyond the completion of his military

commission sentence pursuant to an ongoing armed conflict with Al Qaeda, that conflict is non-

international in nature. Non-international armed conflicts are waged not between nation-states

but with armed groups resulting a threshold of violence that exceeds mere "internal disturbances

and tensions" such as riots or sporadic violence. The treatment of captives in these conflicts is

governed by Common Article 3 of the Geneva Conventions, but not the other provisions of the

Third and Fourth Geneva Conventions that would apply in international armed conflict. In non-

international armed conflict specifically, a captive may be detained only if there is a valid reason

both for the initial deprivation of liberty and for the continuing deprivation of liberty. *See* Jean-

Marie Henckaerts & Louise Doswald-Beck, 1 *Customary International Humanitarian Law*, Rule

128(C), at 451 (Int'l Comm. of the Red Cross 2009) ("Persons deprived of their liberty in

relation to a non-international armed conflict must be released as soon as the reasons for the

deprivation of their liberty cease to exist."), https://ihl-databases.icrc.org/customary-

ihl/eng/docs/v1_rul_rule128.

      61.     Because Petitioner is no longer part of Al Qaeda and has served his sentence,

there is no valid reason for his continuing detention in the context of non-international armed

conflict.[19]

---

[19] As Admiral Patrick Walsh, USN, Vice Chief of Naval Operations, concluded more than a
decade ago when reviewing detention operations at Guantanamo for the Obama administration,
the failure to transfer detainees who are approved for transfer negatively "impact[s] the [U.S.

62.    The government nonetheless has long argued that the indefinite detention of
Guantanamo detainees should be informed by analogy to international armed conflict principles,
including in particular the concept of detention until the end of hostilities.  *See infra*, ¶ 52.  Even
if international armed conflict principles were properly applicable in non-international armed
conflict, which they are not, international armed conflict rules would not in any event justify
Petitioner's detention until the end of hostilities.

63.    Properly applied, international armed conflict recognizes only two categories of
captives: "combatants" and "civilians."  Each is a term of art under the law of war.  Combatants
are entitled to a privilege of belligerency (*i.e.*, they have a legal right to participate in armed
conflict) and corresponding combat immunity from prosecution for their lawful participation in
hostilities.  They may become prisoners of war upon capture, and may be prosecuted only for
war crimes.  Civilians, by contrast, lack the privilege of belligerency as well as combat
immunity.  They may become internees upon capture.  They may also be prosecuted criminally
under domestic law for their participation in hostilities (as well as for war crimes).  Furthermore,
anyone who is not a combatant/prisoner of war is by definition a civilian/internee, and may be
held indefinitely only as long as that person presents an imperative security threat, unless, again,
they are prosecuted, afforded a fair trial, and held pursuant to a lawfully imposed sentence.[20]

---

government's] long-term ability to comply with Common Article 3 of the Geneva Conventions."
*Review of Department Compliance with President's Executive Order on Detainee Conditions of
Confinement* 74 (2009).

[20] Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the
Protection of Victims of International Armed Conflicts art. 50, June 8, 1977, 16 I.L.M. 1391,
1410 ("A civilian is any person who does not belong to one of the categories of persons referred
to in Article 4 . . . of the Third Convention and in Article 43 of this Protocol.  In case of doubt
whether a person is a civilian, that person shall be considered to be a civilian."); *see also* HCJ
769/02 *Pub. Comm. against Torture in Israel v. Israel* [2006] ¶ 26 ("The approach of customary

64.     Again, however, non-international armed conflicts do not contemplate a status of combatant/prisoner of war.  Those armed conflicts involve only government forces and civilians, who, like civilians in international armed conflict, may be prosecuted for their participation in the conflict—as Petitioner was pursuant to the MCA.[21]

65.     In any case, even if the Court were to apply international armed conflict rules by analogy in the context of non-international armed conflict, which it should not, the Court should interpret AUMF detention authority by analogy to international armed conflict rules that apply to civilians/internees like Petitioner, set forth in the Fourth Geneva Convention, rather than by analogy to provisions in the Third Geneva Convention that only apply to combatants/prisoners of

---

international law is that 'civilians' are those who are not 'combatants' . . . . That definition is 'negative' in nature.  It defines the concept of 'civilian' as the opposite of 'combatant.'" (citing International Criminal Tribunal for the former Yugoslavia)); Int'l Comm. of the Red Cross, *Commentary IV Geneva Convention Relative to the Protection of Civilian Persons in Time of War* 51 (Jean S. Pictet ed., 1958) ("*There is no* intermediate status." (emphasis in original)).

[21] *See* U.N. Human Rights Council, *Report of the Special Rapporteur on Extrajudicial, Summary or Arbitrary Executions, Addendum*, ¶ 58, U.N. Doc. A/HRC/14/24/Add.6 (May 28, 2010) (*prepared by* Philip Alston) ("In non-international armed conflict, there is no such thing as a 'combatant.'"); Gary D. Solis, *The Law of Armed Conflict: International Humanitarian Law in War* 191 (2010) ("The traditional view is that, . . . there are no 'combatants,' lawful or otherwise, in common Article 3 conflicts.  There may be combat in the literal sense, but in terms of [the laws of war] there are fighters, rebels, insurgents, or guerrillas who engage in armed conflict, and there are government forces, and perhaps armed forces allied to the government forces.  There are no combatants as that term is used in customary law of war, however.  Upon capture such fighters are simply prisoners of the detaining government; they are criminals to be prosecuted for their unlawful acts, either by a military court or under the domestic law of the capturing state."); Int'l Comm. of the Red Cross, Statement, *The Relevance of IHL in the Context of Terrorism* (July 21, 2005) (last visited Jan. 17, 2016) ("In non-international armed conflict, combatant and prisoner of war status are not provided for . . . . In non-international armed conflict combatant status does not exist."), https://www.icrc.org/en/doc/resources/documents/faq/terrorism-ihl-210705.htm.

war.  Applying this standard, Petitioner must be released because he has already served his

criminal sentence and does not present an imperative security threat to the U.S. or its allies.[22]

## COUNT V

### PETITIONER'S CONTINUED IMPRISONMENT
### VIOLATES THE EIGHTH AMENDMENT

66.     The Cruel and Unusual Punishment Clause of the Eighth Amendment to the

Constitution of the United States applies to prisoners held at Guantanamo, including Petitioner.

67.     Petitioner's imprisonment at Guantanamo beyond the conclusion of his sentence

violates the prohibition on cruel and unusual punishment because Respondents are aware of his

continued imprisonment; have failed to act or taken only ineffectual action under circumstances

indicating their deliberate indifference to Petitioner's plight; and Respondents' actions have

caused and inflicted Petitioner's unjustified detention.

68.     Petitioner's confinement at Guantanamo also remains—and, in particular, as to

the denial of access to his counsel, is increasingly—punitive notwithstanding that Petitioner has

completed his sentence.

## COUNT VI

### PETITIONER'S CONTINUED IMPRISONMENT VIOLATES DUE PROCESS

69.     The Due Process Clause of the Fifth Amendment to the Constitution of the United

States applies to prisoners held at Guantanamo, including Petitioner.

70.     The Due Process Clause entitles Petitioner to greater process to challenge the

legality of his continued imprisonment than current panel decisions of the D.C. Circuit have

---

[22] The U.S. government surely would not accept a blurring of international humanitarian principles distinguishing combatants and civilians in other conflicts such as the war in Ukraine.

held, including the requirement that Respondents prove by clear and convincing evidence that Petitioner's continued imprisonment is lawful—which it is not under any standard of proof.

71.    The Due Process Clause also limits the duration of Petitioner's imprisonment.  In particular, and without limitation, Petitioner's continued imprisonment violates due process because it is arbitrary, indefinite and perpetual, and does not serve its ostensible purpose of preventing his return to the battlefield.  Petitioner's imprisonment beyond the completion of his military commission sentence offends principles of ordered liberty, and is egregious and shocking to the conscience.

## COUNT VII

### PETITIONER'S CONTINUED IMPRISONMENT
### CONSTITUTES DOUBLE JEOPARDY

72.    The Double Jeopardy Clause of the Fifth Amendment to the Constitution of the United States applies to prisoners held at Guantanamo, including Petitioner.

73.    The Double Jeopardy Clause prohibits Respondents from punishing Petitioner twice for the same offense.  Petitioner's imprisonment at Guantanamo beyond the conclusion of his military commission sentence violates that prohibition because his imprisonment remains, and is increasingly, punitive.  Indeed, by failing and refusing promptly to transfer Petitioner, or, in the interim, to change and improve his conditions since the completion of his sentence, Respondents have unilaterally extended his sentence and increased the punishment for the same offenses for which he already served his sentence.

## COUNT VIII

### THE COURT HAS BROAD STATUTORY AND EQUITABLE AUTHORITY
### TO FASHION APPROPRIATE RELIEF AS JUSTICE AND LAW MAY REQUIRE
### TO REMEDY PETITIONER'S UNLAWFUL IMPRISONMENT

74.    There is no dispute that Petitioner is eligible for transfer from Guantanamo.

75.     Petitioner's prompt transfer from Guantanamo upon the completion of his sentence is required by law.  Unlike Guantanamo detainees who are approved for transfer via the Periodic Review Boards established pursuant to Executive Order 13,567, 76 Fed. Reg. 13,567 (Mar. 7, 2011), Petitioner's transfer is not merely a matter of Respondents' discretion and grace. Rather, like every other prior defendant who has served a military commission sentence at Guantanamo, Petitioner's transfer is not subject to review or determined by the Periodic Review Boards.

76.     Also like every other prior defendant who has served a military commission sentence at Guantanamo, Petitioner's transfer is not subject to certification by the Secretary of Defense pursuant to the statutory requirements first enacted in January 2011 and codified (as amended) most recently in the National Defense Authorization Act for Fiscal Year 2016, Pub. L. No. 114-92, § 1034(a)(1), 129 Stat. 726, 969 (2015).  Petitioner's transfer instead is subject to the statutory exception set forth in § 1034(a)(2), which provides that the transfer certification requirement "shall not apply to any action taken by the Secretary to transfer any individual detained at Guantanamo to effectuate an order affecting the disposition of the individual that is issued by a court or competent tribunal of the United States having lawful jurisdiction."

77.     Military commissions convened pursuant to the MCA, including Petitioner's commission, are competent tribunals of the United States having lawful jurisdiction within the meaning of § 1034(a)(2).  *See*, *e.g.*, 10 U.S.C. § 948d ("A military commission is a competent tribunal to make a finding sufficient for jurisdiction.").  In addition, the order issued by the Convening Authority for Military Commissions on March 11, 2022, finalizing Petitioner's 10-year sentence, which amounted to time-served and resulted in Petitioner's immediate eligibility

for release, was an order effecting Petitioner's disposition under the law of war within the meaning of § 1034(a)(2).[23]

78.     However, in the alternative, even if Petitioner were—for the first time in the history of the Guantanamo military commissions—subject to the Periodic Review Boards or the transfer certification requirements in the 2016 NDAA, which he is not, the Court should exercise its broad statutory and equitable habeas authority to fashion appropriate relief for his unlawful detention.  In particular, and without limitation, to the extent that such bureaucratic restrictions are preventing or delaying Petitioner's transfer from Guantanamo, the Court should issue an order setting them aside pursuant to 28 U.S.C. § 2243 (habeas court shall "dispose of the matter as law and justice require").

79.     The Court also has equitable, common law habeas authority to dispose of Petitioner's case as law and justice require based on the unique facts and circumstances of his case.

80.     Indeed, as the length of Petitioner's imprisonment drags on beyond the conclusion of his sentence, and without foreseeable end, the scope of this Court's equitable habeas review must adapt to the changed circumstances and the corresponding, increased risk of an erroneous deprivation of his liberty.

---

[23] The certification requirements, which were enacted years after Petitioner's offenses, also could not be read to restrict his release from Guantanamo without violating the Ex Post Facto Clause of the Constitution, which apples at Guantanamo, *see supra* n.5, because to read the requirements in that manner would increase Petitioner's punishment beyond his lawfully imposed sentence.  *Cf. Peugh v. United States*, 569 U.S. 530 (2013) (holding that sentencing a defendant to a longer term, under guidelines promulgated after the commission of the criminal acts, violates the Ex Post Facto Clause).

81. The Court should exercise this authority to grant Petitioner's habeas corpus petition and to fashion any and all additional relief, including declaratory or other interim relief, necessary to effectuate Petitioner's expeditious transfer from unlawful detention.

## REQUEST FOR RELIEF

**WHEREFORE**, Petitioner respectfully requests that the Court:

A. Grant the Writ of Habeas Corpus and order Respondents to release him from unlawful detention at Guantanamo;

B. Order Respondents to comply with their non-refoulement obligations under international law and transfer him somewhere other than Pakistan to avoid persecution;

C. Order Respondents to grant him immediate and continuing access to his counsel by telephone or videoconference;

D. Order interim habeas relief and order Respondents to release him from unlawful detention at Guantanamo on bail or parole pending a final judgment in this case; and

E. Order any and all additional relief necessary to effectuate his transfer from unlawful detention at Guantanamo.

Dated: New York, NY
        June 7, 2022

Respectfully submitted,

/s/ Katya Jestin
Katya Jestin (Pursuant to LCvR 83.2(f))
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
Tel:  (212) 891-1685
kjestin@jenner.com

Matthew S. Hellman (Bar No. 484132)
JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
Tel:  (202) 639-6861
mhellman@jenner.com

- and -

J. Wells Dixon (Pursuant to LCvR 83.2(f))
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
Tel:  (212) 614-6423
wdixon@ccrjustice.org

- and –

Nayiri K. Pilikyan (Pursuant to LCvR 83.2(f))
JENNER & BLOCK LLP
633 West 5th Street, Suite 3600
Los Angeles, CA 90071
Tel:  (213) 239-2230
NPilikyan@jenner.com

*Counsel for Petitioner Majid S. Khan*

OF COUNSEL:

COL Wayne J. Aaron
MAJ Michael J. Lyness
United States Army, JAG Corps
Military Commissions Defense Organization
1620 Defense Pentagon
Washington, DC 20301
Tel.  (703) 695-6519
wayne.j.aaron.mil@mail.mil
michael.j.lyness3.mil@mail.mil

## CERTIFICATE OF SERVICE

I hereby certify that on June 7, 2022, I caused the foregoing habeas corpus petition, with

a proposed order, to be filed with the Court and served on counsel for Respondents at the U.S.

Department of Justice, Civil Division, Federal Programs Branch by email and U.S. mail, and on

the Attorney General and U.S. Attorney for the District of Columbia by certified mail.

Terry M. Henry, Esq.
Julia Heiman, Esq.
U.S. Department of Justice
Civil Division, Federal Programs Branch
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530
Tel. (202) 514-4107
Terry.Henry@usdoj.gov
Julia.Heiman@usdoj.gov

Merrick B. Garland, Esq.
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

Matthew M. Graves, Esq.
U.S. Attorney, District of Columbia
U.S. Attorney's Office
601 D Street, NW
Washington, DC 20530

*Counsel for Respondents*

/s/ Matthew S. Hellman
Matthew S. Hellman