**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ———————————————————— ) | |
| MAJID S. KHAN (ISN 10020), ) | |
| ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | Civil Action No. 22-1650-RBW |
| ) | |
| JOSEPH R. BIDEN, JR, ) | |
| President of the United States, et al., ) | |
| ) | |
| Respondents. ) | |
| ———————————————————— ) | |

**RESPONDENTS' COMBINED RESPONSE**
**TO PETITION FOR WRIT OF HABEAS CORPUS AND**
**PETITIONER'S MOTION FOR SUMMARY ORDER,**
**AND RESPONDENTS' MOTION TO HOLD IN ABEYANCE**
**BRIEFING ON CERTAIN ISSUES**

## INTRODUCTION

On March 11, 2022, the Convening Authority for Military Commissions approved a
sentence of ten years for Petitioner pursuant to a plea agreement to offenses including violations
of the laws of war.  On March 1, 2022, Petitioner finished serving the approved sentence, which
ran from the date of his guilty plea in 2012, and he has now filed his Petition for Writ of Habeas
Corpus, ECF No. 1, and a Motion for Summary Order Granting Writ of Habeas Corpus and
Other Relief, ECF No. 15 ("Petitioner's Motion").  Petitioner asks the Court to order an end to
his detention, and, in the interim, to order his conditional release into Guantanamo Bay Naval
Station or the United States.[1]  His Petition invites the Court to take up multiple issues of
constitutional and international law, and to place novel constructions on a number of statutes.
Petitioner's Motion further urges the Court to do so on an expedited, summary basis, and further,
to order interim relief that is barred by binding precedent.  As explained below, Respondents
have authority to continue Petitioner's detention while the Government locates a resettlement
country for him.  And for the several reasons explained herein, the Court should deny

---

[1] Petitioner also seeks access to his counsel by telephone or videoconference.  *See*
Petition for Writ of Habeas, Request for Relief, ¶ C.  However, as explained in the Declaration of
Colonel Matthew J. Jemmott, the Commander of the Joint Detention Group and Deputy
Commander of Joint Task Force Guantanamo (JTF-GTMO), Petitioner continues to be provided
such access via video teleconference calls under procedures applicable to his military
commission proceeding, notwithstanding that he has completed his military commission
sentence.  *See* Jemmott Dec., Ex. 1 hereto, ¶ 4.  Most recently, JTF-GTMO facilitated such a
video call on July 20, 2022, following a short-notice request by counsel.  *See id.*  Thus, that facet
of the relief sought is moot.
    Redacted public versions of the declarations relied upon in this Response are attached as
Exhibits 1 and 2, respectively.  The original versions of both declarations are classified.  Upon
entry of an appropriate protective order addressing the handling of classified and sensitive
information in the case, a matter on which the parties are conferring, unredacted versions will be
submitted to the Court and opposing counsel.

Petitioner's Motion and hold in abeyance briefing on the other numerous, weighty issues that the Petition presents.

The Government already is actively—and urgently—working to facilitate Petitioner's transfer. Since he entered into his plea agreement in 2012, Petitioner cooperated with the Government and provided valuable assistance regarding al-Qaida. In light of that cooperation and to encourage future such cooperation by others, Petitioner's expeditious transfer from United States' custody is particularly important to the Government now that he has completed his sentence. As Petitioner acknowledges, however, repatriation to his country of citizenship, Pakistan, may not be possible; indeed, Petitioner himself does not seek such relief due to his own concerns about the potential for persecution or torture there. Nor is release into the United States possible because U.S. law expressly prohibits the use of funds for the transfer of detainees from Guantanamo Bay to the United States. Accordingly, the Government is seeking to resettle him in a third country, and is working diligently through diplomatic means to identify a resettlement country and effect Petitioner's resettlement as quickly as practicable. Indeed, the Government is giving a high priority to effecting Petitioner's transfer because, *inter alia*, it is in the Government's national security interests to encourage cooperation by individuals accused of acts of terrorism or other offenses triable by military commission, such as Petitioner. The Declaration of Ian C. Moss, Deputy Coordinator for Counterterrorism in the Bureau of Counterterrorism at the U.S. Department of State, describes the intensive outreach the Government has already conducted, engaging with multiple countries regarding Petitioner's potential resettlement. *See* Decl. of Ian C. Moss (Aug. 5, 2022) ("Moss Decl."), Ex. 2 hereto, ¶¶ 6–11. As Deputy Coordinator Moss explains, since the Convening Authority took final action on

Petitioner's sentence, the Department of State has engaged eleven countries on the possibility of accepting Petitioner for resettlement. *Id.* ¶ 7.

Especially in light of the Government's ongoing, extensive diplomatic efforts to find a suitable country for Petitioner's resettlement, the Court should deny Petitioner's request for habeas relief. Without resolving the other issues concerning detention authority under the Authorization for Use of Military Force ("AUMF"), Pub. L. 107-40, 115 Stat. 224 (2001), raised in the Petition, briefing of which the Government below argues should be placed in abeyance, original authority to detain Petitioner under that statute – which was undisputed for the duration of his sentence – necessarily includes the authority to resolve his detention in a safe and orderly fashion. This is consistent with historical practice and makes practical sense; even Petitioner's submission to this Court does not specify the particular country in which he proposes he can and should be resettled, but asks that the Court require only that the Government "transfer him to somewhere other than Pakistan." Petition for Writ of Habeas Corpus, Request for Relief, ¶ B. The Government is working to do just that.

Petitioner's Motion argues that the Government should have undertaken its resettlement efforts sooner, and further urges that the timing of the Government's submissions in this case is evidence that the Government is not trying to resettle Petitioner expeditiously. But, as explained below, the Government undertook the efforts to resettle Petitioner after the length of Petitioner's sentence became clear. And, as Petitioner is aware, those efforts by the State Department commenced well before Petitioner initiated this action, and have continued apace, in coordination with Petitioner's counsel, separately from the work of Department of Justice counsel preparing the Government's response to Petitioner's submissions to this Court. Nothing

- 3 -

in the timing of the Government's submissions to this Court or in the timing of the effort to resettle Petitioner supports Petitioner's argument that the Government has not moved with appropriate speed to effect his transfer.

Nor is there any basis on which to order interim release into Guantanamo Bay Naval Station or the United States, as Petitioner seeks in his Motion.  Although Petitioner cites cases supporting generally the authority of a habeas court to enter interim relief or release on conditions, each of those cases stands only for the proposition that a court may order on a temporary basis a subset of the relief that a court otherwise has the authority to grant.  The precedent makes clear that no such authority exists with respect to the interim relief Petitioner seeks here; indeed, binding case law forecloses either an order requiring Petitioner's release into a portion of a secure military base or into the United States.  And the latter relief is barred not only by precedent but also by statute.  For all these reasons, discussed further below, the Court should deny the interim relief that Petitioner seeks in his Motion and his Petition.

As to the remaining arguments raised in the Petition:  because the Government already is working to effect his transfer as quickly as practicable, as well as facilitating his requests related to counsel access, *see supra* n.1, the Government asks that the Court continue any further response by the Government and deny Petitioner's request for summary relief.  Petitioner's arguments implicate novel statutory interpretation issues; issues of international law; and constitutional issues, including separation of powers concerns, matters that the Court should not take up when there is no need for doing so because the Government is already working to provide Petitioner the requested resettlement relief.  Rather, the Government respectfully asks that the Court permit Respondents time to complete their resettlement efforts.  Respondents,

however, do not object to a requirement to submit status reports on a monthly basis to allow the

Government to keep the Court apprised regarding its ongoing efforts to resettle Petitioner.[2]

## BACKGROUND

### A. Factual Background

In February 2012, "in consideration of agreement by the Convening Authority to approve

a sentence in accord with the limitations set forth in Appendix A [to Petitioner's pretrial

agreement]," Offer for Pretrial Agreement, Ex. 3 hereto, *available at* https://www.mc.mil/

Portals/0/pdfs/Khan/Khan%20(AE012)%20-%20PTA.pdf, Petitioner pled guilty to charges of

conspiracy, murder in violation of the law of war, attempted murder in violation of the law of

war, providing material support for terrorism, and spying.  *See also* Appendix A to Offer for

Pretrial Agreement, Ex. 4 hereto, *available at* https://www.mc.mil/Portals/0/pdfs/Khan/

Khan%20(AE013)%20-%20Appendix%20A.pdf, (reflecting undertakings of the Convening

Authority concerning what the Convening Authority will do or consider when taking action on

Petitioner's sentence).  The factual background underlying Petitioner's plea is outlined in his

Petition and, in greater detail, in the Stipulation of Fact that he entered into in connection with

his guilty plea, also in February 2012.  *See* Petition for Writ of Habeas, ¶ 15; Stipulation of Fact,

*available at* https://www.mc.mil/Portals/0/pdfs/Khan/Khan%20(PE001)%20-

%20Stipulation%20of%20Fact.pdf.

---

[2] Respondents conferred with Petitioner's counsel regarding the relief requested herein. Petitioner's counsel indicated that Petitioner does not object to the Government providing such status reports to the Court at minimum every two weeks, concerning its resettlement efforts, but only if those reports are also provided to Petitioner's counsel and to Petitioner.  Petitioner's counsel further indicated that notwithstanding such status reports, Petitioner would object to a request to hold the case in abeyance.

Petitioner's initial pretrial agreement provided that the Convening Authority would approve a sentence of between 19 and 25 years, *see* Appendix A to Offer for Pretrial Agreement, ¶¶ 1, 3, and that, "[a]t the time the Convening Authority [would take] action on the sentence," the Convening Authority would make a determination "regarding the extent of [Petitioner's] cooperation and substantial assistance." *Id.* ¶ 3. According to the agreement, "[s]hould the Convening Authority, in his sole discretion, determine that [Petitioner had] provided full and truthful cooperation amounting to substantial assistance, the Convening Authority [would] approve a sentence not to exceed 19 years." *Id.*

As part of his pretrial agreement, Petitioner agreed to delay sentencing proceedings in his case for four years from the date on which the military judge accepted his plea, to permit time for him to demonstrate cooperation with the Government. *See* Offer for Pretrial Agreement, ¶ 18. On November 20, 2015, the Convening Authority permitted Petitioner to modify his pretrial agreement, withdrawing his guilty plea to the charge of material support for terrorism and deferring sentencing proceedings for an additional three years. *See* Modification to Feb. 13, 2012 Offer for Pretrial Agreement and Appendix A, *available at* https://www.mc.mil/Portals/0/ pdfs/Khan/Khan%20(AE012A).pdf. On April 13, 2021, Petitioner entered into a second modification of his pretrial agreement deferring sentencing for two additional years and decreasing the range of his potential sentence to 11–14 years. *See* Second Modification to Feb. 13, 2012 Offer for Pretrial Agreement and Appendix A, *available at* https://www.mc.mil/Portals/ 0/pdfs/Khan/Khan%20(AE012B).pdf. Petitioner also received a one-year administrative credit against his eventual sentence, making the effective sentencing range 10–13 years. *See* Ruling on

Motion to Reconsider, *available at* https://www.mc.mil/Portals/0/pdfs/Khan/Khan%20

(AE047O).pdf.

Thus, although Petitioner entered his guilty plea in 2012, pursuant to the pretrial

agreement and its modifications that he entered into with the Convening Authority, sentencing

proceedings, which included determinations regarding his level of cooperation by the Convening

Authority, did not commence until 2021.  *See also* Petition for Writ of Habeas Corpus, ¶ 20.

Petitioner's sentence was not finalized until March 11, 2022, when the Convening

Authority issued an order approving a sentence of 10 years of imprisonment, effectively running

from the date of his February 29, 2012 guilty plea.  *See* Petition for Writ of Habeas Corpus, ¶ 27.

Coupled with credit he received from the commission previously, it transpired that Petitioner had

already finished serving that sentence by March 11, 2022, the date on which it was approved, *see*

*id.* ¶ 28.  Respondents have been working to effect his transfer since that time.

The Government's efforts since the approval of Petitioner's sentence have included

multiple calls between Petitioner's counsel and the State Department to understand Petitioner's

resettlement concerns and preferences as well as his past history, family connections, and

language abilities to maximize his reintegration post-transfer; official diplomatic requests to

multiple countries regarding Petitioner's resettlement; and diplomatic discussions with foreign

government officials about the possibility of Petitioner's resettlement.  Those sensitive

diplomatic efforts remain ongoing, and Petitioner's resettlement continues to be a priority for

Respondents.  *See* Moss Decl., ¶¶ 6–11.

**B. Petitioner's Claims**

Petitioner filed his Petition for Writ of Habeas Corpus on June 7, 2022. *See* ECF No. 1. Therein, he asserts eight causes of action:

1.  First, in Count I, Petitioner asserts that his detention violates the Military Commissions Act, 10 U.S.C. §§ 948a *et seq.*, inviting this Court to be the first to adopt his position that the National Defense Authorization Act for Fiscal Year 2012 (NDAA), Pub. L. No. 112-81, 125 Stat. 1562, in affirming aspects of detention authority "includ[ed]" in the Authorization for Use of Military Force (the "AUMF"), Pub. L. 107-40, 115 Stat. 224 (2001), thereby limits Executive detention authority under the AUMF and renders a person tried under the Military Commissions Act ineligible for continued law of war detention. *See* Pet. For Writ of Habeas Corpus, ¶¶ 34–43.

2.  In Count II, Petitioner argues that the AUMF no longer authorizes his detention and asks the Court to decide whether a detainee who has admitted to having been part of al-Qaida may no longer be detained under the AUMF because he subsequently has cooperated with the Government. *See id.* ¶¶ 47–49.

3.  Likewise, in Count III, Petitioner contends that his cooperation with the Government has rendered his detention unlawful, arguing that continued detention violates the principles stated in the plurality opinion in *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), and the law of war. *See* Pet. for Writ of Habeas Corpus, ¶¶ 51–53. He also asks the Court to find his detention has become unlawful under *Hamdi* and the law of war because he contends the conflict in which he was captured is over or has altered so much over time that detention authority has unraveled. *See id.* ¶¶ 55–57.

4.      Next, in Count IV—overlooking that the Supreme Court and Court of Appeals have relied, by analogy, on the Third Geneva Convention addressing the detention of enemy belligerents to inform detention authority under the AUMF—Petitioner argues that he is analogous to a civilian internee under the Fourth Geneva Convention, the Convention relative to the Protection of Civilian Persons in Time of War, Geneva, Aug. 12, 1949, 6 U.S.T. 3516, and must be released because he does not pose an imperative security threat to the United States or its allies.  *See* Pet. For Writ of Habeas Corpus, ¶¶ 58–65.

5.      Petitioner then advances three constitutional claims:  he contends his detention violates the Eighth Amendment's Cruel and Unusual Punishment Clause, and the Fifth Amendment's Due Process and Double Jeopardy Clauses.  *See id.* ¶¶ 66–73 (Counts V–VII).

6.      Finally, in Count VIII, Petitioner broadly asks the Court to employ its statutory and equitable authority "to fashion any and all relief, including declaratory or other interim relief, necessary to effectuate Petitioner's expeditious transfer from unlawful detention."  *Id.* ¶ 81.  This Count appears to form the basis for Petitioner's request that the Court order his release on bail or conditions pending final judgment.  *See id.*, Request for Relief (D).

### C.  Petitioner's Motion

On July 25, 2022, Petitioner submitted his Motion for a Summary Order Granting the Writ of Habeas Corpus and Other Relief, ECF No. 15.  Therein, Petitioner argues that the Court should grant summary relief on the above-described Petition, *id.* at 1–10, or, in the alternative, order Respondents to show cause why the writ should not be granted and hold an expedited hearing to address the merits of the Petition.  Petitioner's Motion also argues that, if Petitioner is not released within 30 days, the Court should order a hearing to address his conditional release

into the Migrant Operations Center operated by the State Department and the Department of Homeland Security at Naval Station, Guantanamo Bay, or release him into the custody of his family in the United States.  *See id.* at 1, 10–16.

## ARGUMENT

Petitioner does not dispute the authority of Respondents to detain him for the duration of his sentence, *see* Pet. for Writ of Habeas Corpus, *generally*; Petr's Mot., *generally*, but overlooks that that authority, as well as more general law-of-war detention authority, necessarily includes the power to resolve his detention in a safe and orderly manner, such as arranging for his resettlement, particularly when his repatriation to Pakistan is neither desired nor practicable. Respondents are pursuing diplomatic efforts to resettle Petitioner as quickly as practicable.

Petitioner contends in his Motion that there has been inexcusable delay in his case, and to such an extent that summary relief is now warranted.  *See* Petr's Mot. at 2–9.  That is not so. Petitioner's argument that resettlement efforts should have commenced even prior to the Convening Authority's action on his sentence, *see id.* at 2, 6, overlooks the plain terms of his plea agreement.  Petitioner also connects the timing of briefing in this case with the work to resettle him being undertaken by the Government.  *See id.* at 2–3, 6.  This argument is puzzling; as Petitioner's counsel is aware, the Government's urgent effort to resolve Petitioner's detention commenced well before Petitioner initiated this case and that work, including discussions with his legal team, has continued apace.

Particularly under the circumstances presented here—where the Government is already diligently working to provide the ultimate relief sought—the Court should decline to take up the

constitutional issues and novel questions of statutory interpretation and international law raised

in the Petition.

### A. Petitioner's Detention Remains Lawful While the Government Diligently Pursues Diplomatic Efforts to Resettle Petitioner.

Hostilities with al-Qaida remain ongoing (as other Judges of this Court have recently

concluded, *see infra* 34 n.14), and Petitioner is neither a prisoner of war nor a civilian internee to

whom the Geneva Conventions would directly and fully apply.[3]  The Geneva Conventions'

approach to resolving detention is nonetheless instructive, and demonstrates that the authority to

detain must include "authority to resolve"—the authority to detain pending efforts to ensure a

safe and orderly release—while the Government continues to make good-faith efforts to

conclude detention.  For example, this principle is reflected in provisions of the Third Geneva

Convention with respect to the resettlement or repatriation of enemy prisoners of war following

the end of active hostilities and even in the provisions of the Fourth Geneva Convention with

respect to civilian internees.  Both the Third and Fourth Geneva Conventions recognize that,

even in distinct circumstances where international law creates a requirement to repatriate or

resettle a detained individual, the law allows the detaining power reasonable time for any

necessary preparations to make orderly and humane repatriation or resettlement possible.  The

United States and its allies have exercised this authority in prior armed conflicts.  *See infra* pages

14–15 (describing the length of time it took to resettle or repatriate prisoners of war after the

Persian Gulf War of 1991, the Korean War, and World War II).

---

[3] Rather, Petitioner admitted to being an unprivileged enemy belligerent.  *See* Offer for Pretrial Agreement, ¶¶ 7, 27.

Under Article 118 of the Third Geneva Convention, Aug. 12, 1949, 6 U.S.T. 3316, "Prisoners of war shall be released and repatriated without delay after the cessation of active hostilities." *See*, *e.g.*, *Hamdi*, 542 U.S. at 520 (citing Article 118 as articulating law-of-war principles informing detention authority conferred by the AUMF); *Al-Alwi v. Trump*, 901 F.3d 294, 298 (D.C. Cir. 2018) (same). The plain terms of this provision presuppose that repatriation is possible.[4]  In practice, the diplomatic negotiations and logistics involved in repatriation or, in cases where repatriation cannot be effected for humanitarian reasons, resettlement of prisoners of war necessarily take some amount of time to accomplish. To construe Article 118 as requiring, in situations to which it applies, instantaneous release of all prisoners, even if they could not immediately be repatriated, the very moment an armistice is signed would mean turning loose former enemy forces and their supporters in the locale where they had been held—an absurd and untenable situation.

Indeed, the 1960 International Committee of the Red Cross (ICRC) Commentary to Article 118 clarified as to the "[t]ime-limit for repatriation" that, although "[t]he text as finally adopted states that the repatriation must take place 'without delay after the cessation of active hostilities,'" "[t]his requirement does not, of course, affect the practical arrangements which must be made so that repatriation may take place in conditions consistent with humanitarian rules and the requirements of the Convention."  3 Int'l Comm. of the Red Cross, Commentary: Geneva Convention Relative to the Treatment of Prisoners of War, art. 118 at 550 (1960).  The 2020

---

[4] Under the Third Geneva Convention, "repatriation" refers to a return to the power on which the prisoner of war depends, *i.e.* the State to which the prisoner's armed forces belong. "Repatriation" for an individual like Petitioner refers to return to his country of citizenship.

ICRC Commentary to Article 118 expanded upon that concept, explaining that while "[t]he obligation to act 'without delay' is strict," "[n]evertheless, the action to be taken is limited to what is feasible in the specific circumstances and may depend on factors such as the actual number of prisoners interned, the location of the camps and the logistical means available to the Detaining Power at the end of active hostilities, as well as the security situation and the ability of a State to receive the repatriated prisoners."  3 Int'l Comm. of the Red Cross, Commentary: Geneva Convention Relative to the Treatment of Prisoners of War, art. 118 at 4462 (2020). Indeed, the 2020 ICRC Commentary notes that in the context of one conflict in which the time until repatriation was addressed by the Ethiopia-Eritrea Claims Commission, that commission's analysis "offer[s] some guidance on how to interpret the notion of 'without delay'."  *Id.* at 4463. "The Commission stated that 'without delay' does not mean that repatriation has to be instantaneous, acknowledging that '[p]reparing and coordinating adequate arrangements for safe and orderly movement and reception, especially of sick or wounded prisoners, may be time-consuming.'"  *Id.*  The Commission found no violations where a party showed efforts towards release and only found a violation where there was a delay "without providing any explanation for the delay."  *See id.* at 4463; Eritrea-Ethiopia Claims Commission, Prisoners of War— Eritrea's Claim 17, Partial Award, XXVI Reports of International Arbitral Awards 23-72 ¶¶ 147, 157-63 (July 1, 2003).  Thus, although "complete inaction" or a delay in repatriation "without providing any explanation for the delay" is inconsistent with Article 118, there is a recognition that circumstances may require time to arrange for a safe and orderly wind up of detention.  *See also* Office of General Counsel, U.S. Dep't of Def., *Law of War Manual* § 9.37.3 (2016), *available at* https://perma.cc/HYH5-5EYL (June 2015, Updated Dec. 2016) (the requirement

- 13 -

that release and repatriation take place without delay "does not affect the practical arrangements that must be made to ensure that repatriation takes place in a safe and orderly manner in accordance with the requirements of the" Third Geneva Convention).  This is particularly the case where a prisoner refuses or fears repatriation and the detaining power must make arrangements to resettle the prisoner elsewhere.  *See* 3 Int'l Comm. of the Red Cross, Commentary: Geneva Convention Relative to the Treatment of Prisoners of War, art. 118 at 4468-69 (2020).

Reflecting that reality, the United States and its allies have continued the detention of prisoners of war following the end of major conflicts to which the United States has been a party in order to properly resolve repatriation issues or effectuate resettlement where repatriation was not appropriate due to humanitarian or other concerns.  For example, the United States and Coalition forces were dealing with such issues with respect to Iraqi prisoners for several months after the Persian Gulf War concluded in March 1991 because prisoners refused to be repatriated to Iraq.  *See* Final Report to Congress on the Conduct of the Persian Gulf War, Appendix O, at O-20 (Apr. 1992), *available at* https://apps.dtic.mil/sti/pdfs/ADA249390.pdf.  Similarly, after the start of ceasefire negotiations in the Korean War, the United Nations Command continued to hold thousands of Chinese and North Korean prisoners of war for extended periods while it considered whether and how best to resettle them because they refused to return to China and North Korea.  *See* Charmatz & Wit, *Repatriation of Prisoners of War and the 1949 Geneva Convention,* 62 Yale L.J. 391, 392, 412 (1952-1953); Christiane Shields Delessert, Release and Repatriation of Prisoners of War at the End of Active Hostilities: A Study of Article 118, Paragraph 1, of the Third Geneva Convention Relative to the Treatment of Prisoners of War 157-

165 (1977).  And after the end of World War II in 1945, Allied Forces spent several years after

the end of hostilities dealing with such issues with respect to prisoners of war they detained

during the war.  *See id.* at 145-156 & n.53 (referring to repatriation of Soviet citizens between

1944 and 1947, and resolution reached in 1948 for 24,000 English-held German prisoners of

war); Charmatz & Wit, *supra*, at 401 nn.46, 48, 404 n.70; Christiane Delessert, *Repatriation of*

*Prisoners of War to the Soviet Union During World War II: A Question of Human Rights, in*

World in Transition: Challenges to Human Rights, Development and World Order 80 (1979).

      Similar to Article 118 of the Third Geneva Convention, with respect to civilian internees,

Article 133 of the Fourth Geneva Convention, the Convention relative to the Protection of

Civilian Persons in Time of War, Aug. 12, 1949, 6 U.S.T. 3516, is instructive on the scope of

detention authority under the law of war and provides with respect to internments governed by

the Fourth Convention that "[i]nternment shall cease as soon as possible after the close of

hostilities."  The ICRC Commentary clarifies that "this does not mean, in spite of the urgent wish

thus expressed, that internment can always be brought to an end shortly after the end of active

hostilities."  4 Int'l Comm. of the Red Cross, Commentary: Geneva Convention Relative to the

Treatment of Prisoners of War, art. 133 (1958).  Moreover, "[t]he Rapporteurs of the Committee

of the Diplomatic Conference which dealt with this question even explained that it did not even

mean that no one could be interned after hostilities had ended," explaining "[t]he disorganization

caused by war may quite possibly involve some delay before the return to normal."  *Id.*  Rather

than requiring an immediate end to internment no matter the conditions on the ground, the ICRC

Commentary explains that "[w]hat it was wished to avoid, and what this Article will avoid if it is

applied in good faith, is the indefinite prolongation" of detention.  *Id.*

The authority to detain Petitioner while engaged in efforts to effect his transfer and conclude his detention in a safe and orderly fashion can be no less extensive than with respect to prisoners of war and civilian internees under the Third and Fourth Geneva Conventions.  For example, the DoD Law of War Manual explains that, even in distinguishable situations where international law creates an obligation to release a detainee, the responsibility to do so in a safe and orderly manner, as well as operational necessities and logistical constraints, may necessitate and justify continued detention.  *See* DoD Law of War Manual § 8.14.3.2.

And the practical reality remains that the United States requires the agreement of a third country to conclude Petitioner's detention and complete his resettlement.  As detailed in the Declaration of Deputy Coordinator Moss, Respondents are pursuing such arrangements through diplomatic channels.  As Amicus Curiae highlighted, there are also institutional reasons why it is important for the Government that Petitioner be transferred from detention as quickly as practicable.  *See* Br. of Amicus Curiae, ECF No. 14 at 8–13 (explaining why it is important that defendants in general, including Petitioner in particular, be released from detention following completion of their sentence if they enter into a plea deal with the Government).  In short, Respondents are highly motivated to effect Petitioner's transfer and have been working to do just that since his sentence was finalized.

It is important to again note, however, that Petitioner's sentence was finalized only recently on March 11, 2022.  In fact, that Petitioner would complete his sentence on March 1, 2022, was not conclusively established until after that date had already passed, as the Convening Authority could have approved a sentence extending for up to three additional years.  *See supra* 6–7.  As Deputy Coordinator Moss explains, after Petitioner's sentence was approved,

- 16 -

Respondents began their ongoing efforts to find a suitable country to which to transfer him.  *See* Moss Decl., ¶¶ 2, 7.  Respondents note that a suitable resettlement location for Petitioner has yet to be identified, but they continue to pursue that goal through multiple diplomatic channels.  *See id.*, ¶¶ 7–11.

As explained above, although Petitioner's transfer and resettlement are priorities for Respondents—especially given his cooperation with the United States—these are not objectives that Respondents can accomplish unilaterally.  United States law precludes transferring or releasing Petitioner into the United States.  *See* National Defense Authorization Act for Fiscal Year 2022, Pub. L. No. 117-21, § 1033; *see infra* (explaining that Petitioner errs in arguing that this statute does not apply to his situation).  Thus, Respondents' ability to relinquish custody of detainees at Guantanamo, like Petitioner, depends not solely on Respondents' actions but also on the cooperation and assistance of foreign governments or entities to accept them.  Additionally, Petitioner vigorously opposes repatriation to Pakistan, and the State Department is not considering repatriating him.  *See* Moss Decl., ¶ 4.  Like the historical examples noted above from World War II, the Korean War, and Gulf War where detaining powers were provided reasonable time to identify locations for prisoners who refused to be repatriated, so too does the conclusion of Petitioner's detention at Guantanamo entail reasonable time to identify and negotiate with a third country for resettlement, especially when repatriation to his country of citizenship is not practicable.

This practical approach has been applied to past Guantanamo transfers even where the Government itself determined an individual was not subject to continued detention as an individual who was part of or substantially supporting enemy forces or a court granted a

detainee's writ of habeas corpus.  In such cases, particularly where detainees could not be returned to their country of citizenship, the U.S. government continued to hold them at Guantanamo while it made good-faith diplomatic efforts to effect their transfer.  Courts did not order their release by a particular date or to a particular place while the Government provided regular updates on its diplomatic efforts and progress.  *See*, *e.g.*, *infra* (discussing *Kiyemba*, in which the Court of Appeals held that, in light of the government's ongoing diplomatic efforts to resettle the petitioners, the Court did not have "the power to require anything more").

The amount of time necessary for repatriation or resettlement of military detainees is not easy to fix.  The process requires the United States to engage in delicate diplomatic negotiations, to make expert judgments about conditions in foreign countries, and to solicit and evaluate foreign countries' assurances of humane treatment.  The foreign government involved, too, must make its own, often extensive internal evaluations about the appropriateness of the placement; the government may interview the prospective resettlement candidate and may run approval of the transfer through a formal decision-making process internal to that country. Once a foreign government agrees to accept a person for resettlement, further time may be needed to develop a plan for the logistics of the move and the integration of the person into society.

Respondents are working now to secure cooperation and assistance for Petitioner's possible resettlement through diplomatic channels.  *See supra* (describing Respondents' efforts as set forth in the Declaration of Deputy Coordinator Moss).  At least under the authority to conclude detention as discussed above, detention of Petitioner remains lawful, and while Respondents are continuing diplomatic efforts to find an appropriate country for his resettlement, the Court should decline Petitioner's request for intervention at this time.

The Court of Appeals' decision in *Kiyemba v. Obama*, 555 F.3d 1022 (D.C. Cir. 2009),[5] is instructive here.  There, the Court reversed a district court order to release into the United States seventeen Uighurs, Chinese citizens whom the Government had determined should no longer be detained as enemy combatants at Guantanamo but who could not be repatriated to their country of nationality due to humanitarian concerns.  In that setting—which occurred prior to the NDAA's prohibition on the use of funds for transfer of Guantanamo detainees to the United States, *see infra* 29–30—the Court of Appeals concluded that the district court lacked authority to order a Guantanamo detainee's release into the United States and held:  "The government has represented that it is continuing diplomatic attempts to find an appropriate country willing to admit petitioners, and we have no reason to doubt that it is doing so.  Nor do we have the power to require anything more."  *Id.* at 1029.

### B.  The Government Has Acted Diligently to Resolve Petitioner's Detention, and is Continuing to Prioritize the Effort to Resettle Him.

Petitioner acknowledges that the Government is working to resettle him, *see e.g.* Petr's Mot. at 9–10, but urges in his Motion that summary relief is warranted here because the Government did not commence those efforts quickly enough or respond with sufficient speed to the habeas petition he submitted to this Court.  *See* Petr's Mot. at 2–9.  He further asserts that it is "clear" that his release from Guantanamo "is unlikely to happen in the foreseeable future without a court order."  Petr's Mot. at 10.  These arguments are unavailing.

---

[5] The D.C. Circuit opinion at *Kiyemba v. Obama*, 555 F.3d 1022 (D.C. Cir. 2009) was vacated and remanded per 559 U.S. 131 (2010), and then reinstated as amended at 605 F.3d 1046 (D.C. Cir. 2010) (per curiam).

Petitioner's first argument, that resettlement efforts should have begun long before March 2022, relies on his mistaken premise that Respondents have "know[n] for at least a year that his criminal sentence would end on March 1, 2022." Petr's Mot. at 2. Respondents did not have—and indeed, could not have had—such knowledge. Under the Rules for Military Commissions as well as the terms of Petitioner's pretrial agreement, Petitioner's sentence was not finalized until it was considered and approved by the Convening Authority in March 2022. Rule for Military Commissions (RMC) 1107 provides that "[t]he convening authority shall take action on the sentence," RMC 1107(a), and "may for any or no reason disapprove a legal sentence in whole or in part," *id.* 1107(d)(1), or order rehearing on a sentence, *id.* 1107 (e). *See* Rules for Military Commissions, Manual for Military Commissions (2019 Ed.), *available at* https://www.mc.mil/Portals/0/pdfs/Manual%20for%20Military%20Commissions%202019%20Edition.pdf.

Consistent with these provisions, Petitioner's pretrial agreement expressly set forth the considerations that the Convening Authority then undertook to consider "[a]t the time [when] the Convening Authority [would be] tak[ing] action on the sentence." *See* Appendix A to Offer for Pretrial Agreement, ¶ 3. Importantly, those considerations included an acknowledgement that the Convening Authority "in his sole discretion" would be determining whether Petitioner had "provided full and truthful cooperation amounting to substantial assistance" such that the Convening Authority would approve a sentence at the lowest limit of the range of sentences contemplated by the pretrial agreement. *Id.* On March 11, 2022, the Convening Authority issued an order stating that "upon careful review of all submitted matters, [he] approve[d] only

so much of the sentence as provides for ten (10) years confinement." Military Commission Order Number 1-22 (Mar. 11, 2022).

Until the Convening Authority made that determination in his discretion, Petitioner's sentence was not fixed within the range of 10–13 years provided by his pretrial agreement, as modified, *see supra* 6–7. After the Convening Authority's decision, the Government communicated with Petitioner's counsel on multiple occasions regarding preferred resettlement countries and began its efforts to find a resettlement location. *See* Moss Decl., ¶ 6. Respondents have since incorporated that information into their resettlement efforts, and have continued to work with Petitioner's counsel to develop their understanding of Petitioner's resettlement concerns and preferences as well as his past history, family connections, and language abilities.

Notably, that effort commenced before Petitioner filed the instant habeas action. Petitioner attempts to conflate the litigation of this case with the efforts of the Government to resettle him, *see* Petr's Mot. at 2–3, 6, but the State Department's efforts to resolve his detention are not connected with the timing of the Justice Department's submissions to this Court. As Deputy Coordinator Moss explains, Respondents have continued to work, with urgency, to resettle Petitioner, including by coordinating with his legal team and Petitioner himself both before and after the filing of this case. *See* Moss Decl., ¶¶ 6, 11. And, separately, the Justice Department has worked to prepare the Government's response to the Petition. Petitioner cites no rule or order in support of his position that the Government had an obligation to respond to his habeas petition prior to the entry of a Court Order setting the schedule for such a response, and—particularly where Respondents have meanwhile continued to work toward the very result that Petitioner is seeking—the Court should give no weight to that argument.

Finally, as to Petitioner's speculation that his resettlement is "unlikely to happen in the foreseeable future without a court order," Petr's Mot. at 10, Petitioner overlooks that the critical piece missing in the effort to resettle him is the consent of a third country.  Petitioner's argument that a court order is necessary for his release is based:  1) on the case of Asadullah Haroon Gul, a Guantanamo Bay detainee for whom the Government effected his repatriation to Afghanistan after another Judge of this Court granted Mr. Gul's habeas petition, and 2) on the situation of other detainees who, while approved for transfer, currently remain in detention.  *See id.* at 9.  But neither situation is analogous to Petitioner's.

Petitioner's circumstances are materially different from Mr. Gul's because Mr. Gul's release, in the end, depended on his *repatriation*, rather than resettlement in a third country.  As Deputy Coordinator Moss explains, resettlement is a more diplomatically complex process than repatriation and requires a longer period to negotiate; unlike a country repatriating one of its citizens, a situation in which that country may have an obligation to accept or a heightened interest in accepting the individual's return, third countries are under no obligation to extend resettlement.  *See* Moss Decl., ¶ 5; *see also* Delessert, *supra*, at 203 (observing that although there had been cases of States refusing to accept repatriation of sick or wounded prisoners during active hostilities, "[t]here do not seem to be any cases of States of origin refusing to accept the return of prisoners at the end of hostilities") (emphasis omitted).  Mr. Gul's situation thus stands in sharp contrast to Petitioner's case, as Petitioner contends that the "risk of harm is so great that [he] can never return to Pakistan," Petition for Writ of Habeas Corpus, ¶ 22, and seeks resettlement in essentially any other country, *see id.*, Request for Relief (C).  *See also* Petr's Mot.

at 11.  Respondents are pursuing only resettlement at this time; as explained above, that diplomatic process is more complex and often requires a longer timeframe to conclude.

Nor does Petitioner's situation resemble that of those detainees who have deemed eligible for transfer by the Periodic Review Board or the Guantanamo Review Task Force.  *See* Petr's Mot. at 9 (arguing that the continued detention of those detainees supports the necessity for a court order here).  The situation of every one of those detainees is unique and the Government takes numerous factors into account when working through efforts to transfer a specific detainee. As Petitioner recognizes, *see* Petr's Mot. at 2 n.4, the Government has a strong interest in prioritizing his resettlement in particular because, *inter alia*, it is in the Government's national security interests to encourage cooperation by individuals accused of acts of terrorism or other offenses under U.S. law.

In sum, none of the circumstances cited by Petitioner support his position that the Government has delayed the effort to resettle him, and the cases he cites do not support his argument that resettlement is unlikely in the absence of a Court order.  To the contrary, as detailed in the Declaration of Deputy Coordinator Moss, the Government already is undertaking extensive outreach to multiple countries regarding Petitioner's potential resettlement.  *See* Moss Decl., ¶¶ 6 –11.  In light of the intensive efforts already underway, further detailed in the Declaration of Deputy Coordinator Moss, the Court should decline Petitioner's request for intervention at this time.

### C.  Binding Precedent Forecloses the Interim Relief Petitioner Seeks in his Motion.

In addition to his request for summary action on his Petition, Petitioner's Motion requests that, if Petitioner is not released in thirty days, the Court issue interim relief in the form of

conditional release "into the care of migration officials" at Guantanamo Bay Naval Station or "his parole into the custody of his U.S. citizen family members in the United States."  Petr's Mot. at 1, *see also id.* at 10–16.  D.C. Circuit precedent bars such relief.

Preliminarily, Petitioner argues that the Court has the authority to fashion interim relief, and to order conditional release in advance of deciding the ultimate issue in a habeas case.  But that general principle supplies no grounds to order the relief that Petitioner seeks here.  Each of the cases on which Petitioner relies in advancing this argument, *see* Petr's Mot. at 12–15, contemplates only an order that provides some measure of the relief that the court ultimately has the power to grant.  For example, *Hensley v. Municipal Court*, *see* Petr's Mot. at 12 (citing same), addressed a challenge to a petitioner's conviction for a misdemeanor in California while that petitioner had been released on his own recognizance; in the context of determining that that petitioner remained "in custody" for purposes of bringing his habeas petition, the Supreme Court observed that he also would have retained his ability to bring a habeas petition had he begun serving his sentence and the district court thereafter ordered conditional release.  *Hensley,* 411 U.S. 345, 352 (1973).  The hypothetical conditional release in that instance would have been from custody in California, *id.* at 346, presenting none of the constitutionally significant issues arising in Petitioner's case.[6]  Likewise in *Marino v. Vasquez*, *see* Petr's Mot. at 12 (citing same),

---

[6] *In re Shuttlesworth*, 369 U.S. 35 (1962) (per curiam), upon which *Hensley* relied, is no different in this respect.  There, the Supreme Court held that if a petitioner challenging his detention in Alabama could not secure bail from the state court, he could seek habeas relief from the federal court, including on his petition for bail pending final relief.  *See id.* at 35. Again, that the habeas court could grant interim relief by ordering the release of that petitioner into the State of Alabama is inapposite to whether this Court may order the interim release of Petitioner onto a U.S. military installation or into the United States.

where the Ninth Circuit affirmed the district court's release of a California inmate on bail.  812 F.2d 499, 507 (9th Cir. 1987).[7]

In contrast, as explained below, Petitioner asks for two forms of relief that are barred by Circuit precedent and, for one form of relief, statute:  an order to admit a foreign national either onto a portion of a U.S. military installation or into the United States.  Nothing in the case law upon which Petitioner relies permits the Court to fashion an order granting on an interim basis relief that the Court cannot otherwise grant.

**1.  The Court should deny Petitioner's request for an order that he be released into the Migrant Operations Center at Naval Station Guantanamo Bay, Cuba.**

With respect to Petitioner's request to be released into the Migrant Operations Center at Naval Station Guantanamo Bay, Petitioner asks that the Court order a foreign national who has pled guilty to offenses triable by military commission as an unprivileged enemy belligerent against the United States, *see supra*, 5, to be released into a portion of an active U.S. military installation with only "some restrictions of movement . . . escorted by unarmed, [Department of Homeland Security] contractors."  Petr's Mot. at 11–12.  Addressing a similar request by two detainees—Uighurs whom the Government had determined should no longer be classified as enemy combatants—to be released into the 'general population' of Guantanamo, another judge

---

[7] Other cases on which Petitioner relies are even further afield.  For example, *Preiser v. Rodriguez*, *see* Petr's Mot. at 13 (citing same), in observing that habeas courts may fashion relief other than immediate release was discussing the power of the federal courts to adjudicate the legality of one sentence while a petitioner was serving another, and to "restore good time credits" that would shorten the duration of confinement.  411 U.S. 475, 487 (1973).  And *Carafas v. LaValle*, *see* Petr's Mot. at 13 (citing same), addressed "whether the expiration of petitioner's sentence, before his application was finally adjudicated and while it was awaiting appellate review, terminate[d] federal jurisdiction with respect to the application."  391 U.S. 234, 239 (1968).

of this Court observed "[s]uch an order would raise serious constitutional problems" because "Guantanamo Bay is a secure military installation under the command of military officers whose mission is an ongoing part of the President's duties as commander in chief." *Qassim v. Bush*, 407 F. Supp. 2d 198, 202 (D.D.C. 2005).  The Court explained:  "[p]etitioners cite no authority for the proposition that I can order the military to allow a civilian, much less a foreign national, access to a military base, and of course I cannot." *Id.*[8] (citing *Cafeteria & Rest-Workers Union, Local 473 v. McElroy*, 367 U.S. 886, 890, 893 (1961)).

Indeed, "[t]he control of access to a military base is clearly within the constitutional powers granted to both Congress and the President," *McElroy*, 367 U.S. at 890, not to the courts, and the power in turn delegated to a commanding officer "summarily to exclude civilians from the area of his command" is both "historically unquestioned," *Greer v. Spock*, 424 U.S. 828, 838 (1976) (citation omitted), and expressly conferred by law, *see McElroy*, 367 U.S. at 890–92.  As the Supreme Court observed in *McElroy*,

> The power of a military commandant over a reservation is necessarily extensive and practically exclusive, forbidding entrance and controlling residence as the public interest may demand . . . It is well settled that a [p]ost [c]ommander can, under the authority conferred on him by statutes and regulations, in his discretion, exclude private persons and property therefrom, or admit them under such restrictions as he may prescribe in the interest of good order and military discipline.

*Id.* at 893 (internal quotation marks and citations omitted).

---

[8] In the same decision, the Court declined to accept Respondents' position regarding their authority to wind up the petitioners' detention in that case, but the Court's reasoning was grounded in the Court's conclusion that the petitioners' detention had not been lawful in the first instance and misapplication of *Zadvydas v. Davis*, 533 U.S. 678 (2001), and *Clark v. Martinez*, 543 U.S. 371 (2005).  *See Qassim*, 407 F. Supp. 2d at 200–01; *see infra* at 31–32 (discussing inapplicability of *Zadvydas* and *Clark* in this context).

The Court in *Qassim* concluded that this precedent "of course" precludes an order that a foreign national be released into Naval Station Guantanamo Bay, 407 F. Supp. 2d at 202, but it is worth noting that there are additional reasons why the Court should not order Petitioner's interim release into the Migrant Operations Center.

"Habeas corpus is 'governed by equitable principles,'" *Munaf*, 553 U.S. at 693 (quoting *Fay v. Noia*, 372 U.S. 391, 438 (1963)), and "'prudential concerns' . . . may 'require a federal court to forgo the exercise of its habeas corpus power.'" *Id.* (quoting *Withrow v. Williams*, 507 U.S. 680, 686 (1993), and *Francis v. Henderson*, 425 U.S. 536, 539 (1976), respectively). Here, even if the Court had the authority to order the requested relief,[9] prudential concerns would counsel against doing so because Petitioner plainly is not among the categories of individuals—specifically, undocumented noncitizens[10] interdicted or intercepted in the Caribbean region—that the Migrant Operations Center was established to house. *See* Exec. Order No. 13276, 67 Fed. Reg. 69985, § 1(a)(i) (Nov. 15, 2002) (providing that the Migrant Operations Center "house and provide for the needs of" "any undocumented aliens [the Secretary of Homeland Security][11] has

---

[9] Petitioner also offers no support for his position, *see* Petr's Mot., generally, that the Court may order a detainee like Petitioner be transferred from the custody of the Department of Defense into the custody of Department of Homeland Security and the Department of State, and Respondents' counsel are aware of no such case.

[10] This brief uses "noncitizen" as equivalent to the statutory term "alien," *i.e.*, "a person not a citizen or national of the United States." *See Barton v. Barr*, 140 S. Ct. 1442, 1446 n.2 (2020) (quoting 8 U.S.C. § 1101(a)(3)).

[11] Although Executive Order 13276 initially referred to the Attorney General in this role, after the creation of the Department of Homeland Security, Executive Order 13286 transferred the functions of the Attorney General under Executive Order 13276 to the Secretary of Homeland Security. *See* Exec. Order No. 13286, 68 Fed. Reg. 10619, § 1 (Feb. 28, 2003).

reason to believe are seeking to enter the United States and who are interdicted or intercepted in the Caribbean region").  Petitioner admitted to being an unprivileged enemy belligerent, *see* Offer for Pretrial Agreement, ¶¶ 7, 27, who was captured in Pakistan, *see* Pet. For Writ of Habeas Corpus, ¶ 7; he was not interdicted or intercepted in the Caribbean region.

In sum, the Court should not—and, indeed, cannot, in view of binding precedent concerning Executive authority over access to secure military installations—order Petitioner's interim release into Naval Station Guantanamo Bay.

**2.   The Court must deny Petitioner's request for an order that he be brought to the United States.**

Nor can the Court grant Petitioner's request for his interim release into the custody of his U.S.-citizen family members in the United States.  Such relief is barred, not only by binding precedent, but also by statute.

Petitioner acknowledges "the current legislative restriction on 'transfer or release to or within the United States' of a Guantanamo 'detainee,'" Petr's Mot. at 15 (quoting John S. McCain National Defense Authorization Act for Fiscal Year 2019 ("NDAA"), Pub. L. No. 115-232, § 1033, 132 Stat. 1636, 1953 (2018)), but contends that he is not a "detainee" to whom the statute applies.  *See* Petr's Mot. at 15.  Petitioner is mistaken.  Section 1033's own terms set out its scope, and that scope plainly includes him.  The statute provides that it applies to "Khalid Sheikh Mohammed or *any other detainee* who—(1) is not a United States citizen or a member of the Armed Forces of the United States; and (2) is or was held on or after January 20, 2009, at United States Naval Station, Guantanamo Bay, Cuba, by the Department of Defense."  NDAA § 1033 (emphasis added).  Petitioner acknowledges that he was transferred to Guantanamo Bay

in 2006, and has been detained there since that time, *see* Petition for Writ of Habeas Corpus, ¶¶ 1, 8, placing him squarely within this definition.  And, if the inclusion of "any other detainee" left any room for doubt as to the sweep of the provision, the reference to Khalid Sheikh Mohammad demonstrates that Petitioner cannot be correct in his position that a "detainee" does not include a criminal defendant.  *See* Petr's Mot. at 15.  Khalid Sheikh Mohammad was a criminal defendant at the time this statute was promulgated, *see* Office of Military Commissions, Docket of 9/11: Khalid Sheikh Mohammad et al., *available at* https://www.mc.mil/CASES/ MilitaryCommissions.aspx (providing a link to the docket); that the statute includes him as an example and then refers to "any *other* detainee," NDAA § 1033 (emphasis added), demonstrates that Petitioner errs in insisting that he, as a criminal defendant "is not classified as a detainee." Petr's Mot. at 15.  Indeed, it is telling that Petitioner offers no citation for that position and does not identify by whom he contends he is not so classified.  *See id.*; *see also* DoD Directive 2310.01E, DoD Detainee Program, March 15, 2022, available at:  https://www.esd.whs.mil/ Portals/54/Documents/DD/issuances/dodd/231001e.pdf?ver=6y1Oz3QqY1slOmu_p9g9Fw%3d %3d, Glossary at p.16 (defining "detainee" for the purpose the issuance to include "[a]ny individual captured by, or transferred to, the custody or control of DoD personnel pursuant to the law of war.").

Petitioner also contends that the language of Section 1033 does not prohibit his requested "parole" into the United States, which he contends is "qualitatively different from what the statute prohibits, *i.e.* the resettlement of detainees such as the Uighurs in the United States."  But the text of the statute contains no such limitation.  Instead, it prohibits the use of funds "to transfer, release, or assist in the transfer of or release to or within the United States, its territories,

or possessions" the detainees to whom it applies.  NDAA § 1033.  There are no grounds on

which to limit that text to "resettlement" only, and Petitioner cites none.  *See* Petr's Mot. at 15.

To the contrary, while Petitioner complains of a lack of clarity in the statute, *see id.*, it is difficult

to see any room for doubt as to Congress's meaning in prohibiting "transfer or release" or any

assistance in the transfer or release "to or within the United States, its territories, or possessions"

of Guantanamo Bay detainees.  The interim relief that Petitioner seeks falls squarely within the

statute's prohibition.

The Court of Appeals' decision in *Kiyemba v. Obama* also bars the interim relief that

Petitioner seeks.  Petitioner submits that his situation is materially different from the petitioners

in *Kiyemba*, because, according to Petitioner, that case turned on the Uighur petitioners' "lack of

presence or property in this country."  Petr's Mot. at 16.  He submits that his situation is different

because he "has legal status and other substantial, voluntary ties to the United States."  *Id.*

Petitioner is mistaken.

First, Petitioner misapprehends the holding of *Kiyemba*.  At issue there was "a [habeas]

court order compelling the Executive to release [petitioners] into the United States outside the

framework of the immigration laws."  555 F.3d at 1028.  The Court of Appeals in that case was

unequivocal:  "never in the history of habeas corpus has any court thought it had the power to

order an alien held overseas brought into the sovereign territory of a nation and released into the

general population."  *Id.* at 1029.  Moreover, the Court held that "who can come in and on what

terms is the exclusive province of the political branches."  *Id.* at 1029.  The Court of Appeals

held such an order was contrary to law notwithstanding that the Court "[did] not know whether

all petitioners or any of them would qualify for entry or admission under the immigration laws."

*Id.*[12]

Furthermore, *Zadvydas v. Davis*, 533 U.S. 678 (2001), and *Clark v. Martinez*, 543 U.S.

371 (2005)—the other cases on which Petitioner relies in arguing for conditional release into the

United States[13]—can offer little guidance here.  Both cases interpreted a statute specific to

immigration law, 8 U.S.C. § 123 l(a)(6), to authorize the Government pursuant to that provision

to detain noncitizens physically in the United States only for the period of time reasonably

necessary to effectuate their removal, and added a presumptive six-month limit for such

---

[12] Here, it is known that Petitioner in fact *would not* qualify for admission.  Although Petitioner contends he "has legal status and other substantial voluntary ties to the United States," Petr's Mot. at 16, in reality, Petitioner's actions render him inadmissible to the United States. Petitioner is a Pakistani citizen who entered the United States illegally in July 1996.  In July 1998 Khan was granted asylum status.  See Stipulation of Fact ¶¶ 13-14.  On December 27, 2001, he was issued a travel document that allowed him to travel and return to the United States. That document was valid for one year.  *Id.* ¶ 22.  On January 4, 2002, he departed the United States and remained outside the country following the expiration of the travel document that would have permitted his lawful return.  *See id.* ¶¶ 93-99.  Records of United States Citizenship and Immigration Services ("USCIS") also reflect that on January 11, 2022, due to Petitioner's criminal convictions and for engaging in terrorist activity, USCIS denied his prior application for adjustment of status to that of a lawful permanent resident.  Indeed, the Court in *Paracha v. Trump*, 453 F. Supp. 3d 168 (D.D.C. 2020), found there had been a plan by Petitioner and associates—one of whom was the petitioner in that case—to falsely create the appearance that Petitioner had not left the United States because his ability to return depended on having a valid travel document and that document had expired while he was in Pakistan.  *See id.* at 226 (relying in part on Petitioner Khan's Pretrial Agreement Stipulation of Facts); *see also Khan v. Bush*, No. 06-cv-1690 (RBW) (D.D.C. May 21, 2007), ECF 24 at 3-5 (prior habeas proceeding discussing Petitioner's status); *see also* Stipulation of Fact, ¶¶ 11, 13–14, 93–99 (acknowledging that Petitioner provided false reasons for obtaining his refuge travel documents, and acknowledging that he never adjusted his immigration status to permanent resident alien).

[13] *Jama v. Immigration & Customs Enforcement*, *see* Petr's Mot. at 15 (citing same), simply restated "the rule announced in [*Zadvydas* and *Clark*]."  543 U.S. 335, 347 (2005).  Thus, *Jama*, too, is inapposite here.

detention, even when the noncitizen in question is inadmissible under the immigration laws and thus has no legal right to remain in the United States.  533 U.S. at 699-670; 543 U.S. at 378. And both cases were careful to limit their holdings:  in *Zadvydas*, the Court specifically stated that it was not announcing a rule that would necessarily apply to cases involving "terrorism or other special circumstances where . . . [there would be a need for] heightened deference to the judgments of the political branches with respect to matters of national security."  533 U.S. at 695.  In *Clark*, the Court expanded upon that statement, explaining that the court's interpretation of § 1231(a)(6) would not affect the ability of the government to detain noncitizens under other authority.  543 U.S. at 379, n.4.

Indeed, the Court of Appeals in *Kiyemba* made clear that *Zadvydas* and *Clark* rested "on the Supreme Court's interpretation not of the Constitution, but of a provision in the immigration laws."  *Kiyemba*, 555 F.3d at 1028 (rejecting the argument that *Zadvydas* and *Clark* addressed broadly the "constitutional liberty interests of concededly illegal aliens") (internal quotation omitted).  The Court specifically noted that the result in *Zadvydas* and *Clark* was consistent with the "plenary authority of the political branches over the entry and admission of aliens" because "*the whole point is* Congress has set up the framework under which aliens may enter the United States" and "[t]he Judiciary only possesses the power Congress gives it—to review Executive action taken within that framework."  *Id.* at 1028 n.12 (emphasis added).  Here, in fact, Congress has done just the opposite, enacting a statute that prohibits expenditure of funds to transfer or release detainees from Guantanamo Bay into the United States.  *See supra* 29–30.  That act of Congress, especially when taken together with *Kiyemba*, prohibits the interim relief that Petitioner seeks.

**D. In Light of the Government's Authority to Resolve Petitioner's Detention and the Ongoing Diplomatic Efforts to Resettle Petitioner, the Court Should, at this Time, Hold in Abeyance Briefing on the Numerous Other Issues Raised in the Petition and Decline to Reach the Constitutional Questions Presented Ahead of the Necessity of Doing So.**

Given the ongoing and intensive diplomatic efforts to resettle Petitioner, Respondents respectfully request that the Court, at a minimum, hold in abeyance briefing on the numerous other issues concerning detention authority raised in the Petition while Respondents pursue Petitioner's resettlement. Indeed, while Petitioner's Motion asserts, with little elaboration, that he is likely to succeed on the merits of his claims, and that his claims present "questions of law capable of resolution in a summary proceeding," Petr's Mot. at 6, there are good reasons for the Court not to take up consideration of those claims at this time.

To begin with, holding further briefing in abeyance would prevent the Court from having to adjudicate constitutional issues, including those implicating separation of powers concerns, ahead of the necessity of doing so. *See, e.g. Ashwander v. Tenn. Valley Auth.,* 297 U.S. 288, 346–47 (1936) (Brandeis, J., concurring) ("The Court will not 'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.'" (quotation omitted); *Elk Grove Unified Sch. Dist. v. Newdow,* 542 U.S. 1, 11 (2004) (citing "deeply rooted commitment not to pass on questions of constitutionality unless adjudication of the constitutional issue is necessary" (internal quotation marks omitted)); *Dames & Moore v. Regan*, 453 U.S. 654, 660–61 (1981) (noting the Court's "attempt to confine the opinion to the very questions necessary to decision of the case"). Three of Petitioner's claims, Counts V through VII, expressly raise constitutional issues, asking this Court to adjudicate the applicability of the Fifth and Eighth Amendments to detainees at Guantanamo Bay, including in the context of

- 33 -

detainees such as Petitioner awaiting completion of resettlement efforts.  *See* Pet. For Writ of Habeas Corpus, ¶¶ 66–73.  The applicability of the Due Process Clause, the subject of Count V, is before the Court of Appeals now, *see Al-Hela v. Biden*, No. 19-5079, 2021 WL 6753656 (D.C. Cir. Apr. 23, 2021) (granting petition for rehearing *en banc* on this issue), and Petitioner notes expressly that he is seeking "greater process . . . than current panel decisions of the D.C. Circuit have held."  Pet. For Writ of Habeas Corpus, ¶ 70.  Given Respondents' continuing efforts to transfer Petitioner, the Court should decline this invitation to decide not only the applicability of the Due Process Clause but also to adjudicate the contours of its requirements if it is held to be applicable.

Furthermore, many of Petitioner's claims that are not expressly grounded in the Constitution have constitutional dimensions because they ask the Court to define new limits on the legal scope of Executive detention authority during wartime.  *See, e.g.*, Petition for Writ of Habeas Corpus, ¶¶ 34–43 (arguing the Court should hold the NDAA limits Executive detention authority under the AUMF).  And, although one of Petitioner's claims includes the very assertion that active hostilities have ceased and his detention is unlawful for that reason, *see* Pet. for Writ of Habeas Corpus, ¶¶ 55–57 (Count III), that very challenge—asking the Court to find hostilities have ceased while the Executive asserts that hostilities are ongoing[14]—raises important

---

[14] In connection with the withdrawal of United States forces from Afghanistan, a number of Petitioners have brought claims asserting that the conflict in which they were captured has ended.  The Government has explained in those cases that active hostilities in fact continue, and the Court has thus far uniformly agreed and declined to order release on those grounds.  See, *e.g.*, *Paracha v. Biden*, 2022 WL 2952493 (D.D.C. Jul. 26, 2022) (Friedman, J.); *Husayn v. Austin*, 2022 WL 2093067 (D.D.C. Jun. 10, 2022) (Sullivan, J.); *Gul v. Biden*, 2021 WL 5206199 (D.D.C. Nov. 9, 2021) (Mehta, J.).  Indeed, less than two weeks ago, a United States drone strike

separation of powers issues.  *See, e.g., Al-Alwi*, 901 F.3d at 299 (discussing traditional deference to the political branches as to the existence of active hostilities and whether an armed conflict has been terminated, noting that "[w]hether and when it would be open to this Court to find that a war though merely formally kept alive had in fact ended, is a question too fraught with gravity even to be adequately formulated when not compelled.") (quoting *Ludecke v. Watkins*, 335 U.S. 160, 169 (1948)).

Holding in abeyance briefing on these types of issues raised in the Petition also would conserve the Court's and the parties' resources by preventing the adjudication of issues the Court may never need to reach.  In addition to the constitutional dimensions of the issues presented, the Petition asks this Court to give novel interpretations to statutes, *see* Pet. For Writ of Habeas Corpus, Count I (addressing Petitioner's contentions regarding the interaction of the NDAA and the AUMF), and treaties, *see id.*, Count IV (asking that the Court be the first to hold that detention authority under the AUMF is subject to standards in the Fourth Geneva Convention regarding the internment of civilians, rather than being informed by principles reflected in the Third Geneva Convention which the Courts have considered in these Guantanamo habeas cases), including whether a detainee's cooperation with the Government unravels the Government's detention authority altogether, *see id.*, Counts II, III.

Already, Respondents are working diligently to effect Petitioner's transfer from detention.  And, although the Petition suggests that his living conditions in the meantime have

---

in Kabul killed the then-leader of al-Qaida.  *See* Remarks by President Biden on a Successful Counterterrorism Operation in Afghanistan (Aug. 1, 2022), *available at* https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/08/01/remarks-by-president-biden-on-a-successful-counterterrorism-operation-in-afghanistan/.

been punitive, *see* Pet. for Writ of Habeas Corpus, ¶¶ 30–32, that definitely is not so, as Colonel

Jemmott explains in his declaration.  *See* Jemmott Decl.  Especially against that backdrop and

ahead of the necessity of doing so, this Court should decline to take up adjudication of the

numerous issues of statutory interpretation and constitutional and international law raised in the

Petition.

## CONCLUSION

For all the reasons set forth herein, the Court should deny Petitioner's request for habeas

relief and Petitioner's Motion, and at a minimum, hold in abeyance any further briefing on the

issues raised in the Petition for Writ of Habeas Corpus, and instead permit Respondents to update

the Court monthly regarding their efforts to find a suitable country in which to resettle Petitioner

and thus conclude his detention.


Dated: August 8, 2022                                            Respectfully submitted,


                                                                 BRIAN M. BOYNTON
                                                                 *Deputy Assistant Attorney General*

                                                                 ALEXANDER K. HAAS
                                                                 *Branch Director*

                                                                 TERRY M. HENRY
                                                                 *Assistant Branch Director*


                                                                 */s/ Julia A. Heiman*
                                                                 JULIA A. HEIMAN (D.C. Bar No. 986228)
                                                                 *Senior Counsel*
                                                                 United States Department of Justice
                                                                 Civil Division

Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20530
Tel: 202-616-8480
*Julia.Heiman@usdoj.gov*